Approved:

ELISHA J. KOBRE/ AMANDA K. KRAMER
Assistant United States Attorneys

Before:    HONORABLE KEVIN N. FOX
           United States Magistrate Judge
           Southern District of New York

U.S. DISTRICT COURT
FILED
SEP 01 2017
DS
S.D. OF N.Y.

DOC #____

**17 MAG . 6668**

- - - - - - - - - - - - - - - - x
                                 :
UNITED STATES OF AMERICA         :     **SEALED COMPLAINT**
                                 :
                                 :     Violations of 15 U.S.C. §§
          - v. -                 :     78j(b) & 78ff; 17 C.F.R.
                                 :     § 240.10b-5; 18 U.S.C. §§
BENJAMIN CHOW,                   :     1348, 371 and 2.
   a/k/a "Ben Chow Zhou Bin,"    :
   a/k/a "Benjamin Bin Chow,"    :     COUNTY OF OFFENSES:
   a/k/a "Bin Zhou,"             :     New York
                                 :
          Defendant.             :
                                 :
                                 :
- - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

THOMAS MCGUIRE, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI") and charges as follows:

### COUNT ONE
### (Conspiracy to Commit Securities Fraud)

1.  From at least in or about July 2016 through in or about November 2016, in the Southern District of New York and elsewhere, BENJAMIN CHOW, a/k/a "Ben Chow Zhou Bin," a/k/a "Benjamin Bin Chow," a/k/a "Bin Zhou," the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States, to wit, securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff and Title 17, Code of Federal Regulations, Section 240.10b-5.

2.  It was a part and object of the conspiracy that BENJAMIN CHOW, a/k/a "Ben Chow Zhou Bin," a/k/a "Benjamin Bin Chow," a/k/a "Bin Zhou," the defendant, and others known and unknown, willfully

1

and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails, would and did use and employ manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon other persons, in violation of Title 15, United States Code, Sections 78j(b) and 78ff.

## Overt Acts

3.    In furtherance of the conspiracy and to effect its illegal object, BENJAMIN CHOW, a/k/a "Ben Chow Zhou Bin," a/k/a "Benjamin Bin Chow," a/k/a "Bin Zhou," the defendant, and others known and unknown, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a.    On or about September 21, 2016, CHOW sent a voice message to a friend and business associate of CHOW's ("CC-1") regarding a possible merger between a private equity firm managed by CHOW and Lattice Semiconductor Corporation ("Lattice")

b.    On or about September 22, 2016, CC-1 purchased a total of approximately 417,015 shares of Lattice.

(Title 18, United States Code, Section 371.)

## COUNT TWO
### (Securities Fraud)

4.    From at least in or about July 2016 through in or about November 2016, in the Southern District of New York and elsewhere, BENJAMIN CHOW, a/k/a "Ben Chow Zhou Bin," a/k/a "Benjamin Bin Chow," a/k/a "Bin Zhou," the defendant, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails and the facilities of national securities exchanges, in connection with the purchase and sale of securities, used and employed manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2, by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of

2

the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons, to wit, in violation of duties CHOW owed to private equity firms managed by CHOW ("Firm-1" and "Firm-2"), CHOW provided CC-1 with material, non-public information regarding a potential merger between Lattice and Firm-1 and Firm-2 in anticipation that CC-1 would trade on it.

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2; and Title 18, United States Code, Section 2.)

## COUNT THREE
### (Securities Fraud)

5.     From at least in or about July 2016 through in or about November 2016, in the Southern District of New York and elsewhere, BENJAMIN CHOW, a/k/a "Ben Chow Zhou Bin," a/k/a "Benjamin Bin Chow," a/k/a "Bin Zhou," the defendant, knowingly and intentionally executed a scheme and artifice to (a) defraud persons in connection with securities of an issuer with a class of securities registered under Section 12 of the Securities Exchange Act of 1934 and that was required to file reports under Section 15(d) of the Securities Exchange Act of 1934, and (b) obtain, by means of false and fraudulent pretenses, representations, and promises, money and property in connection with the purchase and sale of securities of an issuer with a class of securities registered under Section 12 of the Securities Exchange Act of 1934 and that was required to file reports under Section 15(d) of the Securities Exchange Act of 1934, to wit, CHOW provided CC-1 with material, non-public information regarding a potential merger between Lattice and Firm-1 and Firm-2 in anticipation that CC-1 would trade on it.

(Title 18, United States Code, Sections 1348 and 2.)

The bases for my knowledge and the foregoing charges are, in part, as follows:

6.     I am currently employed as a Special Agent with the FBI and have been for approximately 14 years.  I am currently assigned to a squad responsible for investigating violations of the federal securities laws and related offenses, including insider trading. I have participated in investigations of such offenses, and have made and participated in arrests of individuals who have committed such offenses.

7.     The information contained in this affidavit is based upon my personal knowledge, as well as information obtained during this investigation, directly or indirectly, from other sources and agents, including documents and information provided to me by the U.S. Securities and Exchange Commission ("SEC") and other business records.    Because this affidavit is prepared for the limited purpose of establishing probable cause, I have not set forth each and every fact I have learned in connection with this investigation.    Where communications and events are referred to herein, moreover, they are related in substance and in part.    Where dates, figures, and calculations are set forth herein, they are approximate.

## RELEVANT ENTITIES AND INDIVIDUALS

8.     At all times relevant to this Complaint:

a.     Firm-1 was a private equity investment firm headquartered in Beijing, China.

b.     Firm-2 was a private equity buyout fund, headquartered in Palo Alto, California, with offices in Beijing, China, focused on investing in technology companies.

c.     BENJAMIN CHOW, a/k/a "Ben Chow Zhou Bin," a/k/a "Benjamin Bin Chow," a/k/a "Bin Zhou," the defendant, was, from in or about February 2016 to in or about October 2016, a Managing Director with Firm-1.    In or about October 2016, CHOW founded Firm-2 and has since been Managing Partner of Firm-2.    CHOW holds a Ph.D. in aeronautics and a Masters in Business Administration.

d.     CC-1 was a friend and business associate of CHOW. CC-1 was a partner at a third private equity firm, based in Hong Kong.    CC-1 and CHOW previously worked together at a different private equity firm.

e.     Lattice Semiconductor Corporation ("Lattice") was a publicly traded technology company headquartered in Portland, Oregon.    Lattice's shares traded under the symbol "LSCC" on the Nasdaq Stock Market, which is located in Manhattan, New York. Among other products, Lattice specialized in developing and manufacturing field-programmable gate arrays ("FPGAs"), which are integrated circuits designed to be configured by a customer or a designer after manufacturing.

## SUMMARY OF THE INSIDER TRADING SCHEME

9.   As set forth below, there is probable cause to believe that BENJAMIN CHOW, a/k/a "Ben Chow Zhou Bin," a/k/a "Benjamin Bin Chow," a/k/a "Bin Zhou," the defendant, provided to CC-1 material, non-public information relating to a potential merger between Lattice and Firm-1 and later Firm-2, and CC-1 in turn used such information to make profitable securities trades.   Specifically:

a.   As Managing Director of Firm-1 and later Managing Partner of Firm-2, CHOW obtained material non-public information regarding a potential merger agreement between Lattice and Firm-1 and later Firm-2.   Information concerning the potential merger agreement was subject, among other things, to nondisclosure agreements executed between Lattice and Firm-1 and later between Lattice and Firm-2 and by CHOW's employment agreement with Firm-2.

b.   In violation of these agreements, and in breach of his duties to Firm-1 and Firm-2, CHOW provided CC-1 with material non-public information regarding the potential merger between Lattice and Firm-1 and later Firm-2.   On multiple occasions, CC-1 made profitable trades in Lattice shortly after receiving the information from CHOW, yielding a total of approximately $5 million in profits.

## CHOW'S CONFIDENTIALITY OBLIGATIONS

10.   Based in part on my review of documents publicly filed by Lattice with the SEC and records provided by the Financial Industry Regulatory Authority ("FINRA"), I have learned the following, in substance and in part:

a.   On or about April 27, 2016, Lattice and Firm-1 entered into a nondisclosure agreement relating to a potential merger between the parties.   Based upon my knowledge, training and experience, I know that such nondisclosure agreements typically prohibit, among other things, the parties and their officers and employees from disclosing or using for improper purposes confidential information obtained in connection with a potential transaction between the parties.

b.   On or about September 9, 2016, shortly after Firm-2 was formed, Lattice and Firm-2 entered into a nondisclosure agreement on the same terms as were agreed upon with Firm-1.

        c.    At all times relevant to this Complaint, Firm-2 employees were subject to a written corporate policy, contained within its employment agreement, titled "Confidentiality and Non-Competition."   This policy, which refers to Firm-2 as Party A and the employee as Party B, provided in part as follows:

     (a)   During the Term of this Contract and after the cancellation or termination of this Contract, Party B shall comply with the confidentiality policies set forth by Party A:

        (i)    without the written consent from Party A, Party B shall not (1) use any Proprietary Information [as defined below] for any circumstances not related to the performance of his/her duties; (2) disclose to any third party any Proprietary Information by any means; (3) use or permit any third party to use any Proprietary Information obtained by improper means;

       (ii)    Party B has the obligation to make all endeavors to prevent any third party from stealing the Proprietary Information.

     (b)   For the purpose of this Contract, "to obtain by improper means" . . . includes obtaining Proprietary Information by means of . . . violating confidentiality obligation, inducing others to violate the confidentiality obligation[s] or other similar means.

        d.    The term "Proprietary Information" in this Confidentiality and Non-Competition policy was defined to include, among other things, "the corporate files and documents of Party A, including but not limited to: various contracts, agreements, letters of intent"; "any information in connection with the commercial activities and business development of Party A,"; and "any information relating to Party A's financial conditions, such as its assets, liabilities, receivables, state of operation and investments."

## CHOW PROVIDED CC-1 MATERIAL NONPUBLIC INFORMATION
## RELATING TO THE LATTICE MERGER

11.  Based in part on my review of documents publicly filed by Lattice with the SEC, data obtained from a cellular telephone used by CC-1,[1] and records from a particular securities brokerage firm (the "Broker"), I have learned the following, in substance and in part:

a.  On April 8, 2016, a representative of a financial advisor to Firm-1 contacted a financial firm working with Lattice and expressed interest in discussing a potential merger transaction with Lattice.

b.  On or about April 27, 2016, Lattice and Firm-1 entered into a nondisclosure agreement relating to a potential merger between the parties.

c.  In or about May 2016, BENJAMIN CHOW, a/k/a "Ben Chow Zhou Bin," a/k/a "Benjamin Bin Chow," a/k/a "Bin Zhou," the defendant, participated as representative of Firm-1 in several discussions with Lattice's senior management relating to a potential offer by Firm-1 to acquire Lattice.

d.  On or about July 5, 2016, CHOW arranged to meet with CC-1 at a location in China.  Later that night, CC-1 purchased a total of approximately 248,268 shares of Lattice.[2]

_____

[1] CC-1's cellular telephone ("CC-1's Phone") was seized on or about February 3, 2017 pursuant to a search warrant issued in the United States District Court for the Northern District of California.  CC-1's Phone was searched pursuant to that warrant and a subsequent warrant issued in the United States District Court for the Southern District of New York.  The descriptions below of text messages and voice messages obtained from CC-1's Phone, which were in Chinese, are based upon my review of draft transcriptions and/or translations prepared by language specialists or linguists specializing in the Chinese language employed by the FBI.

[2] The trading activity ascribed to CC-1 in this Complaint was conducted through brokerage accounts all nominally held at the Broker by relatives of CC-1 and other individuals I believe are associated with CC-1, including accounts held in the names of CC-1's elderly parents (the "Nominee Accounts").  I believe that it was CC-1 who conducted the trading described herein in part based upon records provided by the Broker showing that the same internet protocol addresses and same electronic devices were used at various

e.   Two days later, on or about July 7, 2016, Firm-1 submitted a non-binding indication of interest, proposing to acquire all the outstanding shares of Lattice for $8.00 per share in cash.  Based on the closing trading price of $5.32 for Lattice common shares on the previous trading day, July 6, 2016, the proposal implied a premium of 50%.  Firm-1's July 7, 2016 submission contemplated that Firm-1 and Lattice would approach the Committee on Foreign Investment in the United States ("CFIUS"), which is an inter-agency government committee authorized to review transactions that could result in control of a United States business by a foreign person.

f.   On or about July 12, 2016, CHOW exchanged text messages with CC-1 relating to Firm-1's confidential indication of interest in acquiring Lattice.  In these text messages, CC-1 informed CHOW that CC-1 had sent CHOW "two FPGA reports" and asked whether CHOW needed a "CFIUS related attorney."  As set forth above, FPGA products are one of the products Lattice manufactures and CFIUS review was contemplated as a necessary step in Firm-1's proposed acquisition of Lattice.  CHOW responded the same day that he had received the FPGA reports and "[o]ur group uses [a particular law firm (the "Law Firm")].  They're ok with CFIUS."  From a public SEC filing, I have learned that the Law Firm was the law firm advising Firm-1 in connection with its potential acquisition of Lattice. CC-1 also asked whether CHOW needed to meet with bankers.  CHOW responded, in part, that he did not need bankers but would meet "with someone from the semiconductor industry . . ."

g.   Later on or about July 12, 2016, CHOW agreed via text message to meet with CC-1 the following day, July 13, 2016 at CHOW's office in Beijing, China.  Beginning on or about July 13, 2016 through July 22, 2016, CC-1 purchased a total of approximately 280,283 shares of Lattice.

h.   On or about July 28, 2016, Firm-1 submitted a revised non-binding indication of interest in acquiring Lattice in an all-cash transaction for a price between $8.75 and $9.00 per share.  Based on the closing trading price of $6.14 for Lattice common shares on the previous trading day, this proposal implied

_____

times in or about February 2016 to access all the Nominee Accounts. During the period from in or about July 2016 through on or about November 2, 2016, the Nominee Accounts were used to purchase a total of approximately 7,096,214 shares of Lattice.  During this same period, the Nominee Accounts sold a total of approximately 53,500 shares of Lattice.

a premium of between 43% and 47%.  The following two business days, Friday, July 29, 2016, and Monday, August 1, 2016, CC-1 purchased a total of approximately 150,000 shares of Lattice.

       i.  On or about August 10, 2016, CHOW sent a text message to CC-1 stating that he was "in the middle of a deal," and therefore could not leave the West Coast of the United States, which is where Lattice is headquartered.  The same day, CC-1 purchased a total of approximately 120,000 shares of Lattice.

       j.  On August 17, 2016, Lattice notified Firm-1 that it received an expression of interest from another party to acquire Lattice, but that it had declined to meet with this other party pursuant to Lattice's obligations under an exclusivity agreement Lattice had entered with Firm-1. Via text message, CHOW and CC-1 agreed to meet that same day. Later that day, CC-1 purchased a total of approximately 35,800 shares of Lattice.

       k.  On or about September 2, 2016, Lattice senior management was informed that CHOW was in the process of forming a new private equity fund, which ultimately became Firm-2.  That same day CHOW and CC-1 spoke twice by phone.

       l.  On or about September 9, 2016, Lattice and Firm-2 entered into a nondisclosure agreement on the same terms as were agreed with Firm-1.  That same day, CC-1 purchased a total of approximately 44,554 shares of Lattice.  The following day, September 10, 2016, Firm-2 submitted a non-binding indication of interest to acquire Lattice for $8.30 per share in an all-cash transaction. Based on the closing trading price of $5.98 for Lattice common shares on the previous trading day, the proposal implied a premium of 39%.

       m.  On or about September 13, 2016, Lattice and Firm-2 entered into an exclusivity agreement, providing that Lattice would not initiate discussions regarding a potential acquisition with any third party through at least October 4, 2016.  Also on September 13, 2016, the Law Firm, now acting as counsel to Firm-2, provided Lattice's counsel with a draft merger agreement.

       n.  The same day, on or about September 13, 2016, CHOW agreed to meet with CC-1 at the China World Trade Center in Beijing, China.  Later on the same day, CC-1 purchased approximately 116,387 shares of Lattice.  The following day, September 14, 2016, CC-1 purchased 260,501 shares of Lattice. And on or about September 15, 2016, CC-1 purchased an additional approximately 536,310 shares of Lattice.

o.     On or about September 16, 2016, CC-1 sent a text message to another individual ("Individual-1") stating, in pertinent part, "[a] friend said LSCC's project is moving forward. Do you have any insight?"   That same day, CC-1 purchased a total of approximately 208,300 shares of Lattice.

p.     On or about September 21, 2016, CC-1 sent CHOW a voice message relating to the potential merger between Lattice and Firm-2.   In particular, CC-1 related, in substance, that he had learned from a banker that "the company that does FPGA," - by which I believe CC-1 was referring to Lattice which, as noted above, develops FPGA technology - has concerns over obtaining CFIUS approval for a merger with a Chinese entity and that if "they" (Lattice) had any other options, "they" (Lattice) would probably not consider a Chinese buyer.

q.     CHOW responded that same day, September 21, 2016, at approximately 10:42 p.m. stating that "we should be able to sign the contract soon. Yeah."   Beginning the following day, through and including October 12, 2016, CC-1 purchased a total of approximately 2,206,760 shares of Lattice.

r.     On or about October 17, 2016, CC-1 arranged via text message to meet with CHOW at 12:30 p.m. that day at the China World Trade Center in Beijing, China.   Following this meeting, CC-1 sent text messages to two individuals advising them to purchase shares of Lattice.   To one of these individuals, CC-1 wrote, in pertinent part, "Is your position loaded?  If not, purchase 5-10% [position] of LSCC at around $6.  (not urgent, buy in batches over 3-5 days)."   To the other, CC-1 wrote, in pertinent part, "Just buy 25,000 shares of LSCC (Either change a position, or use the remaining 1/3.) For the $150,000 position, I will bear the risk for you." Also beginning the day of this meeting, October 17, 2016, through and including October 24, 2016, CC-1 purchased a total of approximately 1,931,102 shares of Lattice.

s.     On or about November 1, 2016 Lattice senior management met with representatives of Firm-2 and finalized the merger agreement.   That same day, CC-1 purchased a total of approximately 427,949 shares of Lattice.

t.     On or about November 2, 2016, Lattice's board of directors formally approved the transaction whereby Firm-2 would purchase all shares of Lattice common stock for $8.30 per share in cash.   That same day, CC-1 purchased approximately 476,500 shares of Lattice.

u.   The following day, November 3, 2016, Firm-2 and Lattice formally executed an "Agreement and Plan of Merger" (the "Merger Agreement") and issued a joint press release announcing the merger which noted, among other things, that the $8.30 per share price "represents a 30% premium to Lattice's last trade price on November 2, 2016, the last trading day prior to announcement." The agreement was signed by CHOW on behalf of Firm-2.

v.   On or about November 3, 2016, CC-1 sold a substantial quantity of the Lattice shares he had purchased, resulting in a profit of approximately $5 million.

### CHOW AND CC-1's RELATIONSHIP AND CHOW'S FALSE STATEMENTS IN FINRA'S INSIDER TRADING INQUIRY

12.   Based on my review of correspondence between FINRA and the Law Firm, I have learned that as part of FINRA's inquiry into possible insider trading in Lattice relating to the November 3, 2016 merger, BENJAMIN CHOW, a/k/a "Ben Chow Zhou Bin," a/k/a "Benjamin Bin Chow," a/k/a "Bin Zhou," the defendant, was asked to provide certain information relating to CHOW's relationship with CC-1 and the circumstances under which any knowledge of the events leading up to the announcement may have been gained by CC-1.   The Law Firm responded to FINRA, stating that CHOW had provided, in substance and in part, the following information:

a.   CHOW and CC-1 were former colleagues at a private equity firm unrelated to the firms described elsewhere in this Complaint.   CHOW and CC-1 were also social acquaintances.

b.   CHOW believes he had coffee with CC-1 in July 2016 at which time they discussed the semiconductor industry generally and CHOW asked CC-1 to forward semiconductor industry analyst reports.

c.   CHOW also believes he and CC-1 had a conversation in August 2016 after CC-1 had seen news reports about the formation of a particular Chinese investment fund which, through a subsidiary, is the only limited partner of Firm-2. CHOW asked CC-1 whether CC-1 could recommend possible limited partners.

d.   During the period from September 9, 2016 through November 2, 2016, CHOW may have exchanged social text or voice messages with CC-1.

e.   CHOW does not recall discussing Lattice with CC-1 and is not aware of any circumstance by which CC-1 may have gained

knowledge of Firm-2's business activities relating to the merger during the period from September 9, 2016 through November 2, 2016.

WHEREFORE, the deponent prays that an arrest warrant be issued for BENJAMIN CHOW, a/k/a "Ben Chow Zhou Bin," a/k/a "Benjamin Bin Chow," a/k/a "Bin Zhou," the defendant, and that CHOW be imprisoned or bailed as the case may be.

THOMAS MCGUIRE
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

Sworn to before me this
1st day of September, 2017

THE HONORABLE KEVIN N. FOX
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK