**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

UNITED STATES OF AMERICA

v.

BENJAMIN CHOW,
        a/k/a "Ben Chow Zhou Bin,"
        a/k/a "Benjamin Bin Chow,"
        a/k/a "Bin Zhou,"

                Defendant.

17 Cr. 667 (GHW)

---

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S PRE-TRIAL MOTIONS FOR A BILL OF PARTICULARS AND PRODUCTION OF EXCULPATORY AND IMPEACHMENT MATERIAL**

George S. Canellos
Katherine R. Goldstein
Adam Fee
MILBANK, TWEED, HADLEY & McCLOY LLP
28 Liberty Street
New York, New York 10005-1413
Telephone: 212-530-5000
Facsimile: 212-530-5219

*Counsel for Defendant Benjamin Chow*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................1

I.      THE USAO MUST PROVIDE A BILL OF PARTICULARS ...........................5

      A.      Relevant Facts ............................................................................5

      B.      Applicable Law............................................................................6

      C.      Discussion ...................................................................................7

              1.      The USAO Should Identify All Known Co-Conspirators ..........................7

              2.      The USAO Should Particularize the Material Non-Public Information Allegedly Shared with Michael Yin .......................................8

              3.      The USAO Should Particularize Any Duty that it Contends Mr. Chow Breached ....................................................................11

              4.      The USAO Should Particularize Any Benefit that it Contends Mr. Chow Received in Exchange for Providing Inside Information ...............13

              5.      The USAO Should Particularize Which Trades it Contends Were Based on Inside Information .......................................................15

II.     THE USAO MUST REVIEW AND PRODUCE *BRADY* OR *GIGLIO* MATERIAL IN THE POSSESSION OF THE SEC .......................................16

      A.      Relevant Facts...........................................................................16

               1.      The Joint Investigation............................................................16

               2.      The Relevant Discovery.............................................................19

      B.      Applicable Law..........................................................................20

      C.      Discussion .................................................................................22

CONCLUSION....................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Brady v. Maryland,*
    373 U.S. 83 (1963) ................................................................................ *passim*

*Chiarella v. United States,*
    445 U.S. 222 (1980) ................................................................................ 13

*Dirks v. SEC,*
    463 U.S. 646 (1983) ................................................................................ 2, 3

*Giglio v. United States,*
    405 U.S. 150 (1972) ................................................................................ *passim*

*Kyles v. Whitley,*
    514 U.S. 419 (1995) ................................................................................ 20

*U.S. ex rel. O'Donnell v. Countrywide Home Loans, Inc.,*
    822 F.3d 650 (2d Cir. 2016) ................................................................... 4, 12

*Salman v. United States,*
    137 S. Ct. 420 (2016) .............................................................................. 3

*United States v. Barnes,*
    158 F.2d 662 (2d Cir. 1998) ................................................................... 6

*United States v. Bortnovsky,*
    820 F. 2d 572 (2d Cir. 1987) ................................................................. 6

*United States v. Davidoff,*
    845 F.2d 1151 (2d Cir. 1988) ................................................................ 16

*United States v. Giffen,*
    379 F. Supp. 2d 337 (S.D.N.Y. 2004) .................................................... 24

*United States v. Gupta,*
    848 F. Supp. 2d 491 (S.D.N.Y. 2012) .................................................... 20, 21

*United States v. Hankins,*
    872 F. Supp. 170 (D.N.J. 1995) .............................................................. 21

*United States v. Martoma,*
    12 Cr. 973 (PGG), 2013 WL 2435082 (S.D.N.Y. June 5, 2013) ............ 8

*United States v. Martoma*,
   869 F.3d 58 (2d Cir. 2017)........................................................................2, 3, 14

*United States v. Martoma*,
   990 F. Supp. 2d 458 (S.D.N.Y. 2014)..............................................21, 22, 24, 25

*United States v. Newman*,
   773 F.3d 438 (2d Cir. 2014)...................................................................................3

*United States v. O'Hagan*,
   521 U.S. 642 (1997)...............................................................................................2

*United States v. Prange*,
   11 Cr. 10415 (NMG), 2012 WL 3263606 (D. Mass. Aug. 7, 2012) ....................21

*United States v. Rajaratnam*,
   09 Cr. 1184 (RJH), 2010 WL 2788168 (S.D.N.Y. July 13, 2010) ................ *passim*

*United States v. Torres*,
   901 F.2d 205 (2d Cir. 1990)..................................................................................6

*United States v. Triumph Capital Grp., Inc.*,
   544 F.3d 149 (2d Cir. 2008).................................................................................20

*United States v. Whitman*,
   904 F. Supp. 2d 363 (S.D.N.Y. 2014)..................................................................13

**Statutes**

15 U.S.C § 78ff .............................................................................................................1

15 U.S.C. § 78j(b) .........................................................................................................1

18 U.S.C. § 2 ................................................................................................................1

18 U.S.C. § 371 ............................................................................................................1

18 U.S.C. § 1348 ..........................................................................................................1

**Other Authorities**

17 C.F.R. § 240.10b-5 ..................................................................................................1

Fed. R. Crim. Proc. 7(f) ...............................................................................................6

iii

Benjamin Chow respectfully submits this memorandum of law, and accompanying declaration of Katherine R. Goldstein ("Goldstein Decl."), in support of his motions:  (1) for a bill of particulars; and (2) to compel the government ("USAO") to comply with its obligations to search for and produce information pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. United States*, 405 U.S. 150 (1972).

## PRELIMINARY STATEMENT

The criminal insider trading charges against Mr. Chow are entirely ill-conceived and inadequately pled.  To compound the difficulty facing Mr. Chow in preparing for trial, the USAO has also refused to comply with its obligations under *Brady* and *Giglio*.

The government charges Mr. Chow with having provided material non-public information to Shaohua "Michael" Yin (identified as "CC-1" in the Indictment) regarding a potential acquisition of Lattice Semiconductor Corporation ("Lattice") by Mr. Chow's private equity fund, Canyon Bridge.  *See* Indictment ("Ind.") ¶ 6.  Mr. Yin is alleged to have purchased shares in Lattice in advance of the public announcement of the acquisition, and allegedly made certain of these purchases in and around the time of communications with Mr. Chow.  *Id.*  The Indictment charges fourteen counts: conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371 (Count One); securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. § 240.10b-5, and 18 U.S.C. § 2 (Counts Two-Thirteen); and securities fraud in violation of 18 U.S.C. §§ 1348 and 2 (Count Fourteen).

The law of insider trading has been in a state of constant flux over the last several years.  As a result of a series of Second Circuit and Supreme Court decisions, key elements of the offense have been redefined and then redefined again.  Under both the "classical" and "misappropriation theory" of insider trading, tipping or trading on the basis of material, non-public information is

1

unlawful when the information is disclosed in breach of a duty.[1]  *United States v. Martoma*, 869 F.3d 58, 63 (2d Cir. 2017) (observing that it is "the breach of a fiduciary duty or other 'duty of loyalty and confidentiality' that is a necessary predicate to insider trading liability") (quoting *United States v. O'Hagan*, 521 U.S. 642, 652 (1997)).  A breach of fiduciary duty, in turn, requires proof of a personal benefit to the tipper.  In *Dirks v. SEC*, the Supreme Court explained that the test for whether there has been a breach of a fiduciary duty or other duty of loyalty and confidentiality is whether "the [tipper] personally will benefit, directly or indirectly, from his disclosure."  463 U.S. 646, 662-63 (1983).  What constitutes a personal benefit has recently been the subject of intense debate in the courts.

According to *Dirks*, a personal benefit includes a tipper's pecuniary gain or a *quid pro quo* relationship or agreement between tipper and tippee.  *See Dirks*, 463 U.S. at 663-64.  *Dirks* also observed that a personal benefit is conferred in circumstances in which "an insider makes a gift of confidential information to a trading relative or friend," at least where the "[t]ip and trade resemble trading by the insider himself followed by a gift of the profits to the recipient."  *Id.* at 664.  It is with the "gifting" theory of personal benefit, which appears to have been alleged in this case, that courts have recently grappled.

---

[1] The "classical" theory of insider trading concerns the corporate insider's breach of a fiduciary duty owed to the company's shareholders when the insider uses the company's material non-public information for personal gain.  *United States v. O'Hagan*, 521 U.S. 642, 652 (1997).  The insider, by virtue of his relationship of trust and confidence to the shareholders, has a duty to disclose or to abstain from trading so as not to take advantage of shareholders who are at an informational disadvantage.  *See id.* at 652.  The "misappropriation" theory of insider trading acknowledges that one who is not a corporate insider may violate the securities laws by taking, or "misappropriating," confidential information and using it for personal gain, in breach of a duty owed to the source of the information.  *See id.*  The requisite betrayal under misappropriation theory is the "undisclosed, self-serving use of a principal's information . . . in breach of a duty of loyalty and confidentiality, [which] defrauds the principal of the exclusive use of that information."  *Id.*

In *United States v. Newman*, the Second Circuit dramatically refashioned the personal benefit test, holding that in the gift-giving context, the government must prove the existence of a "meaningfully close personal relationship" between tipper and tippee that "generates an exchange that is objective, consequential, and represents at least a potential gain of a pecuniary or similarly valuable nature."  773 F.3d 438, 452 (2d Cir. 2014).  The *Newman* formulation was widely viewed as raising the bar on the proof necessary to meet the personal benefit test.  Less than two years later, in *Salman v. United States*, the Supreme Court rejected the "pecuniary or similarly valuable nature" requirement imposed by *Newman* as inconsistent with *Dirks*.  137 S. Ct. 420, 428 (2016).  And just this past summer, in *United States v. Martoma*, the Second Circuit concluded that *Newman*'s requirement of a "meaningfully close personal relationship" was "no longer good law" in light of *Salman*.  869 F.3d at 69, 70.  Rather, the Court instituted a new test, holding that the tipper personally benefits whenever "the information was disclosed with the expectation" that the tippee would trade on it, and the disclosure resembled trading by the tipper followed by a gift of the profits to the tippee.  *Martoma*, 869 F.3d at 70 (internal citations and quotations omitted).  The petitioner in *Martoma* has sought rehearing and rehearing *en banc*.  *See* Pet. for Rehearing *En Banc* for Defendant-Appellant, *United States v. Martoma*, 14-3599 (2d Cir. Oct. 6, 2017) ECF No. 192.

This case is one of the first to include post-*Martoma* insider trading charges.  No court in this District has yet fashioned jury instructions concerning the personal benefit test to comport with the changes wrought by the *Martoma* decision.

There are other novel aspects to this case.  *First*, the Indictment charges Mr. Chow not only with insider trading offenses under Title 15 (Counts Two-Thirteen) but also under Title 18 (Count Fourteen).  It appears that the USAO has only recently begun to charge insider trading under 18

U.S.C. § 1348.  *See, e.g.*, Indictment, *United States v. Blaszczak*, 17 Cr. 357 (LAK) (S.D.N.Y. May 24, 2017) ECF No. 10.  No court in this District of which Mr. Chow is aware has instructed a jury on a Title 18 insider trading offense.  *Second*, the Indictment appears to allege that the breach of duty upon which the charged violations are based is a breach of contract.  *See* Ind. ¶¶ 7-8. Accordingly, this Court will have to grapple with the Second Circuit's recent decision holding that a scheme to defraud cannot be based solely on the *existence* of a contractual breach, but rather requires evidence of fraudulent intent *at the time of contract execution*.  *See U.S. ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d 650, 656-57 (2d Cir. 2016).

Against this backdrop of legal uncertainty and flux, the USAO has prepared a charging instrument that lacks the requisite detail concerning almost all of the elements of the offenses charged.  Beyond a highly edited chronology of Mr. Yin's trading activity and certain interactions with Mr. Chow, the Indictment largely consists of conjecture and argument.  The Indictment is unacceptably vague with regard to the inside information allegedly shared, the duty allegedly breached, the personal benefit allegedly obtained as a result of the alleged tips, and the trades allegedly made on the basis of inside information.  These pleading deficiencies are made all the more stark by virtue of the shifting landscape in insider trading law, creating the very real risk that the USAO's theory of the case will be a moving target as trial approaches.  This would be inherently unfair to Mr. Chow.  The USAO should not be permitted to force Mr. Chow to trial on the basis of an Indictment that requires guesswork to fill in the most basic facts, and based on an ever-evolving theory of insider trading liability.  Accordingly, this Court should order the USAO to provide a bill of particulars so that Mr. Chow can adequately prepare for trial and avoid unfair surprise.

Not only do the Indictment's deficiencies create legally unacceptable obstacles to Mr. Chow's preparation of his defense, but the USAO has also refused to comply with its constitutional and statutory obligations to search for exculpatory and impeachment material.  The Securities and Exchange Commission ("<u>SEC</u>") has brought a civil enforcement action (the "<u>SEC Action</u>") against Mr. Yin for insider trading violations (but not against Mr. Chow), and the USAO has now brought criminal charges against Mr. Chow.  The record in this matter, including numerous sworn affidavits and complaints filed on behalf of both civil and criminal authorities, clearly reflects that the SEC and USAO conducted a joint investigation, thereby obligating the USAO to search the SEC's files for *Brady* and *Giglio* materials, just as the USAO would search its own files. Notwithstanding this obligation, the USAO has disclaimed any obligation to do so.  Because the USAO and SEC conducted a joint investigation of Mr. Chow and Mr. Yin, and because there are exculpatory and impeachment materials in the possession of the SEC—materials that likely caused the SEC to elect to bring a civil action against only Mr. Yin—Mr. Chow respectfully requests that the Court direct the USAO to uphold its duty to search for and produce exculpatory and impeachment materials related to Mr. Chow in the possession of the SEC.

## I.      THE USAO MUST PROVIDE A BILL OF PARTICULARS

### A.      Relevant Facts

To remedy the Indictment's obvious deficiencies, on December 7, 2017, Mr. Chow submitted a discovery request to the USAO, seeking, among other things, additional information "necessary for Mr. Chow to identify with sufficient particularity the nature of the charges in order to prepare for trial and prevent surprise, Fed. R. Crim. P. 7(f)."  (Goldstein Decl. Ex. A, Letter at 3-4, Dec. 7, 2017.)  Mr. Chow requested that the USAO cure certain ambiguities and omissions in the Indictment's allegations and, at a minimum, provide documents reflecting the kind of factual

particulars that the USAO has provided in other recent insider trading cases in this District.[2]  To

date, the USAO has not responded to Mr. Chow's discovery request.

### B.     Applicable Law

In accordance with Federal Rule of Criminal Procedure 7(f), this Court may require the

USAO to file a bill of particulars so that a defendant can "identify with sufficient particularity the

nature of the charge pending against him, thereby enabling [him] to prepare for trial, to prevent

surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the

same offense." *United States v. Bortnovsky*, 820 F. 2d 572, 574 (2d Cir. 1987).  A bill of particulars

is required where the indictment does not "advise the defendant of the specific acts of which he is

accused." *United States v. Torres*, 901 F.2d 205, 234 (2d Cir. 1990) (overruled on other grounds)

(quoting *United States v. Feola*, 651 F. Supp. 1068, 1132 (S.D.N.Y.1987)).  A defendant is entitled

to a bill of particulars when the indictment fails "to provide the defendant with sufficient detail to

defend adequately the charges against him." *United States v. Barnes*, 158 F.2d 662, 665 (2d Cir.

1998).

Because of the potential for unfair surprise at trial, the USAO has been directed to provide

particulars in several recent insider trading cases. *See, e.g.*, *United States v. Rajaratnam*, 09 Cr.

1184 (RJH), 2010 WL 2788168, at *4-9 (S.D.N.Y. July 13, 2010) (ordering bill of particulars that

specified, among other things, the substance of the alleged inside information and the dates on

---

[2] Specifically, Mr. Chow requested that the USAO provide documents reflecting: (1) the identity
of all known co-conspirators; (2) the substance of any material non-public information that the
USAO contends was disclosed; (3) the time, place, and manner of any communications conveying
material non-public information; (4) the amount, timing, and account information relating to any
trades or transactions that the USAO contends were based on material non-public information
disclosed in connection with the offenses charged in the Indictment; and (5) any financial,
reputational, social, or other benefit that the USAO contends was received by Mr. Chow as a result
of the alleged disclosure of material non-public information.  (*Id.*)

which it was provided, in connection with both conspiracy and substantive counts); Goldstein Decl. Ex. B, Order at 1, *United States v. Contorinis*, No. 09 Cr. 1083 (RJS) (S.D.N.Y. May 5, 2010) (ordering bill of particulars with respect to the material, non-public information allegedly disclosed in connection with a charged transaction).

### C.   Discussion

#### 1.   The USAO Should Identify All Known Co-Conspirators

The USAO has identified two co-conspirators, Mr. Chow and Mr. Yin, but the indictment makes reference to other persons without specifying whether they participated in the alleged scheme or not. *See, e.g.*, Ind. ¶ 30 (alleging a conspiracy involving Mr. Chow "and others known and unknown"); ¶ 21 (alleging that Mr. Yin sent a text message to "another individual stating, in substance and in part, that a 'friend' had told" him that the Lattice merger was moving forward); ¶ 23 (alleging that Mr. Yin sent text messages to two unidentified individuals advising them to purchase shares of Lattice). The Indictment's suggestion that others may have traded based, at least in part, on inside information obtained from Mr. Chow and passed by Mr. Yin is particularly problematic. If the USAO is not compelled to specify whether there are additional co-conspirators, Mr. Chow cannot know, for example, whether the USAO will allege that there are remote tippees who participated in the scheme; whether the USAO will seek to offer any trading by such remote tippees as admissible evidence of the scheme; or whether the USAO views any communications between Mr. Yin and the remote tippees as statements made in furtherance of the charged scheme, and thus potentially admissible against Mr. Chow at trial.

The discovery received to date does not answer any of the questions posed above. Rather, it compounds the confusion caused by the Indictment's lack of specificity. The USAO's Rule 16 productions include voluminous phone records, trading records, and bank accounts spanning nearly four years and relating to over 20 people not referenced in the Indictment. The USAO has

also produced over 1,000 pages of electronic messages between Mr. Yin and individuals not named in the Indictment.  Mr. Chow simply has no way of knowing whether the USAO will contend that any of these individuals (or any others) are co-conspirators.

In almost all recent insider trading cases in this District, either the USAO has provided the identities of unindicted co-conspirators of its own accord, or courts have compelled the disclosure of such information.[3]  There is no justification for refusing to identify known co-conspirators, and the USAO should be required to do so at this time.  In the absence of these particulars, Mr. Chow will be faced with needlessly burdensome preparations and the possibility of unfair surprise at trial.

      2.    The USAO Should Particularize the Material Non-Public Information Allegedly Shared with Michael Yin

In order to prepare for trial, Mr. Chow is entitled to know the substance of any inside information he is alleged to have illegally tipped.  *See, e.g.*, *Rajaratnam*, 2010 WL 2788168, at *4 (ordering the government to identify the "reporting period[s]" that were the subject of inside information, and the "substance of the information provided for any period[.]").

---

[3] *See, e.g.*, Goldstein Decl. Ex. C, *United States v. Steinberg*, 12 Cr. 121 (S.D.N.Y. Sept. 18, 2013), ECF No. 299 ("*Steinberg* Bill of Particulars") (government provided bill of particulars, pursuant to court order, setting forth the identity of "known" co-conspirators, including specific "analyst," "portfolio manager," and "other" co-conspirators); *United States v. Martoma*, 12 Cr. 973 (PGG), 2013 WL 2435082, at *7 (S.D.N.Y. June 5, 2013) ("*Martoma* Order") (court order required the government to identify all known co-conspirators); Goldstein Decl. Ex. D, *United States v. Newman*, 12 Cr. 121 (S.D.N.Y. August 29, 2012), ECF No. 111 ("*Newman* Bill of Particulars") (government provided similar bill of particulars as in *Steinberg*); Goldstein Decl. Ex. E, *United States v. Gupta*, 11 Cr. 907 (S.D.N.Y. April 9, 2012), ECF No. 47 at 2 ("*Gupta* Bill of Particulars") (government provided bill of particulars detailing "the identity of additional known co-conspirators in the charged conspiracy"); *United States v. Rajaratnam,* 09 Cr. 1184 (RJH), 2010 WL 2788168, at *1 n.1 (S.D.N.Y. July 13, 2010) (court order noted that the government provided a list of additional known co-conspirators for each count).

For every piece of information allegedly shared with Mr. Yin that the USAO contends was material and non-public, Mr. Chow may elect to show at trial that such information was actually immaterial or publicly available, whether through news articles, analysts' reports or other sources, at the time of the allegedly unlawful disclosure.  But to do so, Mr. Chow must have some basic understanding of the nature and substance of the purported inside information he allegedly shared with Mr. Yin, and precisely when and how it was conveyed.  *Cf. id.* at *2 ("The merits of such a charge depend heavily on the facts and context.  A defendant might argue that the information he sought to obtain was not material, or that it was already public at the time he tried to get it.  But he can only do that if he knows what the information is and when it was conveyed.").

In this case, the allegations concerning the substance of the inside information allegedly provided by Mr. Chow are either non-existent or too vague to allow him to prepare to defend against these charges at trial.  As to the non-existent allegations, the Indictment sets forth at least five instances in which Mr. Chow and Mr. Yin are alleged to have arranged a meeting, following which Mr. Yin is alleged to have traded in Lattice stock.  In these instances, the Indictment is completely silent on what, *if anything*, was communicated between Mr. Chow and Mr. Yin.  *See* Ind. ¶ 12 (alleging that on or about July 5, 2016, Mr. Chow and Mr. Yin "arranged to meet" and that Mr. Yin thereafter purchased Lattice stock); ¶ 14 (alleging that on or about July 12, 2016, Mr. Chow and Mr. Yin "agreed via text message to meet" and that Mr. Yin thereafter purchased Lattice stock); ¶ 17 (alleging that on or about August 17, 2016, Mr. Chow and Mr. Yin "agreed to meet" and that Mr. Yin thereafter purchased Lattice stock); ¶ 20 (alleging that on or about September 13, 2016, Mr. Chow and Mr. Yin "agreed to meet" and that Mr. Yin thereafter purchased Lattice stock); ¶ 23 (alleging that on or about October 17, 2016, Mr. Chow and Mr. Yin "arranged via text message to meet that day" and that Mr. Yin thereafter purchased Lattice stock).

As to those allegations that contain any substance at all, they are entirely non-specific and ambiguous as to what material non-public information was allegedly passed.  For example, the USAO alleges that in one communication Mr. Chow disclosed to Mr. Yin that he was "in the middle of a deal."  Ind. ¶ 16.  It is unclear from the Indictment whether the USAO views this routine communication as material, non-public information disclosed in breach of a duty.  If so, the USAO should be required to so state.

The potential for unfair surprise with respect to all of these allegations must be remedied, as it has in other insider trading cases.  The *Contorinis* case provides an instructive comparison.  In that case, which involved an allegation that the defendant traded in advance of information about an acquisition of a publicly-traded company, the USAO provided, pursuant to court order, a nine-paragraph set of particulars detailing the specific, material non-public information concerning the transaction history allegedly provided by the insider to the defendant, including the timing and pricing of the transaction, with supporting emails attached.  *See* Goldstein Decl. Ex. F, *United States v. Contorinis*, 09 Cr. 1083 (S.D.N.Y. April 13, 2011), ECF No. 22 ("*Contorinis* Bill of Particulars").  Similar information has been disclosed in other insider trading cases.  *See, e.g.*, *Rajaratnam*, 2010 WL 2788168, at *4-9 (ordering government to particularize the "substance of the information provided" in connection with both alleged earnings and acquisitions-related tips).[4]

In light of the bare-bones nature of the Indictment, Mr. Chow respectfully requests that the Court order the USAO to provide him with the necessary particulars concerning the inside

---

[4] *See also* Goldstein Decl. Ex. G, Letter at 2, *United States v. Martoma*, 12 Cr. 973 (PGG) (S.D.N.Y. Mar. 15, 2013) (letter from government disclosing a detailed summary of the nature of the inside information); Ex. C, *Steinberg* Bill of Particulars at 3 (bill of particulars setting forth, among other things, earnings-related confidential information passed or obtained); Goldstein Decl. Ex. D, *Newman* Bill of Particulars at 2 (same); Goldstein Decl. Ex. E, *Gupta* Bill of Particulars at 2-4 (bill of particulars detailing the specific dates and subject matter of the tips).

information allegedly passed so that he can adequately prepare for trial and avoid the unfair surprise that will inevitably ensue if the USAO seeks to fill in the blanks only upon commencement of the trial.

          3.     The USAO Should Particularize Any Duty that it Contends Mr. Chow Breached

The Indictment seems to rely exclusively on two contractual agreements entered into by Mr. Chow and representatives of Lattice as the basis for its theory of duty in this case. *See* Ind. ¶¶ 7-8 (identifying two non-disclosure agreements under the heading "Chow's Confidentiality Obligations"). No other specific sources of duty are specified. Nonetheless, Mr. Chow is charged with committing substantive securities fraud under Title 15 for acting "in violation of duties CHOW owed to Lattice, Firm-1 and Firm-2."[5] Ind. ¶ 33 (Counts Two - Thirteen). In other words, Mr. Chow is charged with violating duties owed to Lattice *and* two private equity firms, China Reform Fund—which employed Mr. Chow through September 2016—and Canyon Bridge— which employed Mr. Chow from September 2016 through the present, and on whose behalf he participated in the Lattice deal.

The USAO should be ordered to resolve the significant tension in the Indictment and particularize the precise duties Mr. Chow is alleged to have breached. As presently drafted, Mr. Chow does not know whether the USAO plans to proceed to trial exclusively on the basis of a theory of a contractual breach, as paragraphs seven and eight of the Indictment suggest, or whether

---

[5] Mr. Chow is charged with insider trading under both Title 15 and Title 18. (*Compare* Counts Two-Thirteen *with* Count Fourteen). As noted above, no district court in this District has yet given a jury instruction for insider trading charged 18 U.S.C. § 1348. Of note here, Count Fourteen contains no allegation of breach at all. *See* Ind. ¶ 34. To the extent the USAO seeks to argue that the Title 18 insider trading charge has no breach of duty element, such a position would be starkly at odds with other litigation positions taken by the USAO and inconsistent with the case law, and Mr. Chow should be so informed to avoid unfair surprise.

it will contend that Mr. Chow breached other, unspecified duties owed to China Reform and/or Canyon Bridge.[6]

The distinction is significant.  If the theory of breach relies on an alleged violation of a non-disclosure agreement, the Second Circuit has emphatically held that a mere breach of contract is not sufficient as a matter of law to prove a violation of federal fraud statutes.  *Countrywide Home Loans, Inc.*, 822 F.3d at 662.  In *Countrywide*, the Second Circuit grappled with the intersection of common law fraud principles and the federal mail and wire fraud statutes.  In that case, a jury found the defendants liable in connection with their alleged breach of contract in selling poor-quality mortgages to government-sponsored entities under a statute which premises civil penalties on federal mail and wire fraud violations.  On appeal, the defendants argued that under the common law, "parties cannot allege or prove fraud solely on the basis of a contractual breach—*i.e.*, the common law requires more than simply 'proof that a promise was made and that it was not fulfilled' to sustain a fraud claim."  822 F.3d at 658 (citing *Tenzer v. Superscope, Inc.*, 39 Cal. 3d 18, 30 (1985)).  Acknowledging that "Supreme Court precedent instructs us to apply the common-law understanding of fraud principles to these [mail and wire fraud] statutes, absent inconsistency with their text," the Second Circuit reversed the defendants' convictions.  *Id.* at 656.  In so doing, the Second Circuit reaffirmed the principle that "where allegedly fraudulent misrepresentations are promises made in a contract, a party claiming fraud must prove fraudulent intent *at the time of contract execution*; evidence of a subsequent, willful breach cannot sustain the claim."  *Id.* at 658 (emphasis added).  Of course, common law fraud principles have long been recognized to equally

---

[6] Further evidence of the shifting nature of the USAO's breach theory may be found in the Complaint in this matter, which alleged as sources of Mr. Chow's duties employment policies and the like allegedly in force at Canyon Bridge.  *See* Crim. Compl. ¶¶ 10(c)-(d), ECF No. 1.  These policies do not appear to exist as they were never produced in the Rule 16 discovery and they are not cited in the Indictment.

animate the elements of a securities fraud violation.  *See, e.g.*, *Chiarella v. United States*, 445 U.S. 222, 230 (1980); *accord United States v. Whitman*, 904 F. Supp. 2d 363, 369 (S.D.N.Y. 2014) (Rakoff, J.) (noting that "all the Supreme Court cases dealing with insider trading[] have implicitly assumed that the relevant fiduciary duty is a matter of federal common law, for they have described it and defined it without ever referencing state law").

Thus, if the USAO's theory of breach involves alleged violations of the non-disclosure agreements, the law requires the USAO to prove fraudulent intent at the time of contract execution, consistent with Second Circuit precedent, and Mr. Chow would be entitled to a jury instruction to that effect.  In turn, his preparation for trial would clearly focus on the USAO's obligation to prove such fraudulent intent.  If, however, the USAO's theory of breach is different, as the charging language in the Indictment confusingly suggests, Mr. Chow's preparation for trial would alter and expand dramatically.  Accordingly, a bill of particulars is warranted on this critical element of the offense to permit preparation for trial and avoid unfair surprise.

4.      The USAO Should Particularize Any Benefit that it Contends Mr. Chow
        Received in Exchange for Providing Inside Information

Mr. Chow must also prepare to respond to the USAO's proof concerning the personal benefit element of the insider trading charges levied against him.[7]  At this time, however, he is unable to do so because the Indictment is silent on what, if any, personal benefit Mr. Chow derived

---

[7] As noted in note 5, *supra*, Mr. Chow is charged with insider trading under both Title 15 and Title 18.  The law requires the USAO to satisfy the personal benefit element in connection with the insider trading charges under both statutes.  To take a contrary view would be inconsistent with prior practice by the USAO.  *Cf.* Trial Tr. 1616-18 (jury charge), *United States v. Stewart*, 15 Cr. 287 (LTS) (S.D.N.Y. Aug. 9, 2016), ECF No. 207 (instructing jury that insider trading charged as wire fraud offense under Title 18 has the same elements as insider trading charged as Title 15 offense).  Should the government take a different view of its legal obligations, however, Mr. Chow is entitled to know what elements the  USAO contends it must prove to obtain a conviction under the Title 18 count.  In the absence of such particulars, Mr. Chow cannot adequately prepare for trial.

from the alleged offenses.  The absence of any particulars on the benefit element is noteworthy because, as set forth above, the Supreme Court and the Second Circuit have redefined the personal benefit test three times in the last three years.

Beyond a single passing reference to Mr. Yin being a "friend and business associate" of Mr. Chow's, *see* Ind. ¶ 4, neither the Indictment nor any discovery of which Mr. Chow is aware offers any detail on the personal benefit allegedly received by Mr. Chow.  It is utterly unclear from this lone allegation whether the USAO views itself as being bound by the newly defined two-part test set forth in *Martoma*—requiring the government to prove (1) that the tipper disclosed inside information with "the expectation that [the tippee] would trade on it," and (2) that the disclosure "resemble[d] trading by the insider followed by a gift of the profits to the recipient," 869 F.3d at 69—some other test, or some combination of the multiple tests articulated in the case law.[8]

The USAO's decision to remain silent on the issue is a clear departure from other insider trading cases in this District in which particulars concerning the alleged personal benefit have been provided, even in the absence of changes in the decisional law.  *See, e.g.*, Goldstein Decl. Ex. G, Letter at 2, *United States v. Martoma*, 12 Cr. 973 (PGG) (S.D.N.Y. March 15, 2013) ECF No. 28 ("The Government alleges that Dr. Gilman directly and indirectly benefited by providing Inside Information to Martoma through (1) financial payments made by the Gerson Lehrman Group to Gilman for consultations with Martoma and (2) the development of a perceived friendship with

---

[8] Perhaps the USAO is being evasive about its personal benefit theory because, applying the *Martoma* test, the charges in this case make no sense.  Under *Martoma*, the government must prove that Mr. Chow provided material, non-public information to Mr. Yin with the *expectation* that Mr. Yin would trade in Lattice stock—trades that most certainly would have driven up the price of Lattice stock during the course of the deal negotiations, thereby making the acquisition more costly and the potential for profit more remote.  In other words, the government would have the obligation to prove to the jury beyond a reasonable doubt that Mr. Chow committed acts that could only have harmed his own self-interest and his bottom line.  Should the USAO view its obligations differently, Mr. Chow is entitled to be so informed.

Martoma"); Goldstein Decl. Ex. D, *Newman* Bill of Particulars at 1, 5 (providing "the nature of the benefit received by the tippers of the information" such as "career advice and actual assistance —as well as promises of future assistance—with opportunities to work in the securities industry" and "to maintain a personal friendship"); Goldstein Decl. Ex. C, *Steinberg* Bill of Particulars (same); Goldstein Decl. Ex. E, *Gupta* Bill of Particulars at 4-5 (providing that the benefit received included, *inter alia*, furthering the friendship between defendant-tipper and tippee; a gift of material, nonpublic information to the tippee; the cultivation of a "personal and business relationship" given the tippee's status and connections in the business world; and the defendant's hope that the tippee would help him recoup some or all of his losses in an investment with the tippee).  No exception is warranted here.

As noted above, this case will be among the first insider trading cases to go to trial following the *Martoma* decision this summer.  In order to prepare for trial, Mr. Chow must have an understanding of the USAO's theory of the "personal benefit" he is alleged to have received.

> 5.    The USAO Should Particularize Which Trades it Contends Were Based on Inside Information

With respect to the substantive insider trading charges against Mr. Chow under Title 15 (Counts Two-Thirteen), the USAO identifies certain trading in Lattice stock by Mr. Yin.  *See* Ind. ¶ 33.  With respect to the substantive insider trading charge against Mr. Chow under Title 18 (Count Fourteen), however, the USAO does not identify a single trade.  *See* Ind. ¶¶ 34-35.  In addition, the government's Rule 16 production includes trading records involving hundreds of companies completely unrelated to Lattice, spanning from October 2013 through July 2017, and tens of thousands of trades.

If the USAO is to offer evidence at trial of allegedly illegal trades beyond those specifically identified in the Indictment—either trades in Lattice or any other stock—it must provide notice

through a bill of particulars.  *See United States v. Davidoff*, 845 F.2d 1151, 1154 (2d Cir. 1988) (reversing conviction for failure to grant bill of particulars where indictment alleged extortion of one company, but at trial the defendant was "confronted with evidence of extortions aimed at entirely different companies").

As with the other particulars sought by Mr. Chow, courts in this District have required the USAO to set forth all allegedly unlawful trades in a bill of particulars.[9]  To take one recent example, in *United States v. Walters*, Judge Castel ordered the USAO to provide a bill of particulars identifying "[all] trades that [the government] intend[s] to offer in evidence as proof of the crimes charged in this indictment as an unlawful trade," where, as here, the USAO produced trading data for multiple other individuals not named in the indictment and the trading data spanned years prior to the start of the charged conspiracy.  *See* Goldstein Decl. Ex. H, Oral Arg. Tr. at 27, *United States v. Walters*, 16 Cr. 338 (PKC) (S.D.N.Y. Dec. 2, 2016), ECF No. 51.[10]  This case compels the same result.

## II.   THE USAO MUST REVIEW AND PRODUCE *BRADY* OR *GIGLIO* MATERIAL IN THE POSSESSION OF THE SEC

### A.   Relevant Facts

#### 1.   The Joint Investigation

On February 3, 2017, as Mr. Yin was about to board a flight to China departing from San Jose International Airport in California, two FBI agents stopped Mr. Yin, seized his cellphone, and interviewed him.  *See* Crim. Compl. ¶ 11 & n.1, ECF No. 1.  Approximately two days earlier, on

---

[9] In certain cases, the USAO voluntarily identified such trades.  *See Rajaratnam*, 2010 WL 2788168, at *2 (noting government already "identified the trades at issue in the substantive counts.")

[10] *See also* Goldstein Decl. Ex. E, *Gupta* Bill of Particulars at 5-6 (identifying unlawful trades not set forth in superseding indictment).

February 1, 2017, the FBI obtained a warrant in the Northern District of California ("NDCA")

authorizing a search of Yin's phone (the "NDCA Warrant").  In support of the warrant application,

FBI Special Agent Jonathan R. Walthers submitted a sworn affidavit, dated February 1, 2017 (the

"February Affidavit"), which stated:

- The FBI was conducting a criminal investigation of Mr. Yin for insider trading, securities and wire fraud violations.  (*See* Goldstein Decl. Ex. I, Aff. of SA Walthers, ¶¶ 2, 4, dated Feb. 1, 2017.)

- The FBI's Los Angeles Field Office was conducting the criminal investigation "in parallel with a civil investigation by the Los Angeles office of the SEC."  (*Id.* ¶ 4.)

- The facts in the February Affidavit were based on, among other things, "information obtained from attorneys and other support personnel at the Securities and Exchange Commission ('SEC')."  (*Id.* ¶ 3.)

- SA Walthers specifically averred that he had reviewed, among other things, "trading records obtained by the SEC" (*id.* ¶ 7); "the SEC's analysis of the trades" in the relevant trading accounts (*id.* ¶ 8); IP logs and MAC addresses "provided to the FBI by the SEC" reflecting access to the relevant trading accounts as well as "AT&T records provided by the SEC" (*id.* ¶ 9); and had had "discussions with the enforcement staff at the SEC regarding" the trading accounts as well as the specific trades at issue (*id.* ¶¶ 7, 8).

- Among other securities, SA Walthers stated that the investigation had identified suspicious trading in Lattice.  (*Id.* ¶ 8.)

On February 10, 2017, the SEC filed a complaint against Mr. Yin and five relief defendants

(the "SEC Complaint").  The relief defendants were alleged to hold accounts that Mr. Yin used to

make trades based on inside information.  The SEC Complaint did not allege insider trading in

Lattice, and instead primarily focused on allegations involving another stock, DreamWorks

Animation SKG, Inc.  The SEC Complaint expressly referenced the FBI's February 3, 2017

interview of Mr. Yin and the subsequent search of his cellphone.  (Goldstein Decl. Ex. J, SEC

Compl. ¶¶ 4, 155-157.)

Shortly after filing the SEC Complaint, the SEC filed a motion to freeze the assets of Mr.

Yin and the relief defendants; in its moving papers, the SEC described in detail the FBI's efforts

to seize and search Mr. Yin's cellphone, and Mr. Yin's statements to the FBI during the February 3, 2017 interview.   (Goldstein Decl. Ex. K, SEC's Mem. of Law in Supp. of its *Ex Parte* Emergency Application for an Order to Show Cause, Asset Freeze & Other Relief, *SEC v. Shaohua (Michael Yin) et al.*, 17 Civ. 972 (S.D.N.Y. Feb 13, 2017) ECF No. 6).

On May 30, 2017, the SEC filed an amended complaint in the SEC Action (the "SEC Amended Complaint") against Mr. Yin and six relief defendants.   The SEC Amended Complaint added allegations concerning Mr. Yin's allegedly illegal trades in Lattice stock based on material non-public information that he allegedly obtained from Mr. Chow.   (Goldstein Decl. Ex. L, SEC Am. Compl. ¶¶ 153-193.)   The SEC Amended Complaint did not name Mr. Chow, but rather referred to him as the "Canyon Bridge Insider."

The SEC Amended Complaint expressly relied on the FBI's February 3, 2017 interview of Mr. Yin, and provided detailed allegations concerning the substance of Mr. Yin's statements to the FBI during the interview.   (*Id.* ¶¶ 255-261.)   The SEC Amended Complaint also relied extensively on electronic messages between Mr. Yin and Mr. Chow (via the WeChat message app) that were obtained exclusively as fruits of the search of Yin's cellphone by the FBI pursuant to the NDCA Warrant.   (*Id.* ¶¶ 255-56.)

On July 28, 2017, the FBI obtained a second search warrant for Mr. Yin's phone, this time in the Southern District of New York (the "SDNY Warrant").   The supporting affidavit was again submitted by SA Walthers (the "July Affidavit"),[11] and stated:

- SA Walthers' statements in the affidavit were based on information obtained from, among other sources, "conversations with representatives from the [SEC]."   (*Id.* ¶ 2.)

---

[11]   The July Affidavit explained that since the February Warrant had been obtained, "[r]esponsibility for the investigation was subsequently transferred to the United States Attorney's Office for the Southern District of New York, working in conjunction with the FBI."   (Goldstein Decl. Ex. M, July Aff. at n. 2.)

- Based on a review of the contents of Mr. Yin's cellphone following the execution of the NDCA Warrant, and other investigative steps taken by the FBI, SA Walthers believed that Mr. Yin and Mr. Chow "spoke about confidential aspects of the then-potential Lattice acquisition" in advance of the public announcement of the transaction.  (Goldstein Decl. Ex. M, July Aff. ¶ 54(a)(ii).)

On September 1, 2017, the USAO filed a sealed criminal complaint against Mr. Chow, alleging a nearly identical fact pattern concerning the alleged insider trading scheme with Mr. Yin as that set forth in the SEC Amended Complaint.  *See* Crim. Compl. ¶ 11, ECF No. 1.  In the complaint, FBI SA Thomas McGuire, the attesting agent, affirmed that in preparing the affidavit he had relied on, among other things, "documents and information provided to [him] by the U.S. Securities and Exchange Commission."  *Id.* ¶ 7.  The complaint explicitly relied on information derived from the FBI's February 3, 2017 search of Mr. Yin's cellphone—just as had the SEC Amended Complaint.  *See id.*; (Goldstein Decl. Ex. L, SEC Am. Compl. ¶¶ 255-56.)

Following the return of the Indictment in this matter, the USAO issued a press release in which Acting United States Attorney Joon H. Kim "thanked the [SEC] for its assistance." (Goldstein Decl. Ex. N, Press Release, Dep't of Justice, Acting Manhattan U.S. Attorney And FBI Assistant Director Announce Insider Trading Charges Against Managing Director Of Private Equity Fund  (Oct. 30, 2017) Statement, available at https://www.justice.gov/usao-sdny/pr/acting-manhattan-us-attorney-and-fbi-assistant-director-announce-insider-trading-1.)

On November 20, 2017, the SEC sent a letter to the court in the SEC Action, advising the court "of a recently unsealed criminal case that is partly based on factual allegations that are also alleged in the [SEC Amended Complaint]."  (Goldstein Decl. Ex. O, Letter at 1, Nov. 20, 2017, ECF No. 47.)

2.   The Relevant Discovery

The USAO first produced discovery to Mr. Chow on November 17, 2017.  In its cover letter accompanying the production, the USAO stated it "is unaware of any *Brady* material

regarding [Mr. Chow], but will provide timely disclosure if any such material comes to light." (Goldstein Decl. Ex. P, Govt.'s Letter at 2, Nov. 17, 2017.)  Notwithstanding that representation, the November 17 production contained at least one category of documents that plainly constitute *Brady* and *Giglio* material regarding Mr. Chow, namely, communications reflecting that, beginning months *prior* to the first alleged contact between Mr. Yin and Mr. Chow, and continuing through the announcement of the Lattice transaction, Mr. Yin was asking for, and received, information about Lattice from sources *other* than Mr. Chow.

The USAO's initial production also contained approximately 10,000 documents identified as "SEC Production[s]," and thousands of additional documents that appear to have been produced, in the first instance, to the SEC by third parties.

By letter dated December 7, 2017, Mr. Chow asked that the USAO produce all exculpatory or impeachment material in the possession of the USAO and the SEC.  (*See* Goldstein Decl. Ex. A, Letter at 6-9, Dec. 7, 2017.)  The USAO has not responded to Mr. Chow's request, but previously represented to Mr. Chow's counsel that (i) the USAO and the SEC did not conduct a joint investigation, and (ii) it was under no obligation to search the SEC's files for exculpatory or impeachment material.

### B.    Applicable Law

Under *Brady*, the USAO "has a duty to disclose all material evidence favorable" to Mr. Chow.  *United States v. Triumph Capital Grp., Inc.*, 544 F.3d 149, 161 (2d Cir. 2008); *see Kyles v. Whitley*, 514 U.S. 419, 437 (1995).  Where the USAO has conducted a joint investigation with the SEC, the "prosecutor's duty extends to reviewing the materials in the possession of that other agency for *Brady* evidence."  *United States v. Gupta*, 848 F. Supp. 2d 491, 492-93 (S.D.N.Y. 2012) (Rakoff, J.) ("That separate government agencies having overlapping jurisdiction will cooperate in the factual investigation of the same alleged misconduct makes perfect sense; but that they can

then disclaim such cooperation to avoid their respective discovery obligations makes no sense at all."); *cf. United States v. Hankins*, 872 F. Supp. 170, 173 (D.N.J. 1995) ("[W]hen the Government is pursuing both a civil and criminal prosecution against a defendant stemming from the same underlying activity, the Government must search both the civil and criminal files in search of exculpatory materials.").

In concluding that an investigation was jointly conducted, "it is enough that the agencies are engaged in joint fact-gathering, even if they are making separate investigatory or charging decisions, because the purpose of *Brady* is to apprise the defendant of exculpatory evidence obtained during the fact-gathering that might not otherwise be available to the defendant." *Gupta*, 848 F. Supp. 2d at 494.  While the inquiry is case-specific and fact intensive, it is clear that the "joint investigation" standard does *not* require "coterminous," or identical, investigations, but focuses instead on whether the two agencies elected to investigate at least some of the facts of a case "together."  *Id.* at 495; *see Martoma*, 990 F. Supp. 2d at 460 (joint investigation standard "involves consideration of the 'degree of cooperation between agencies,' such as their coordination in conducting witness interviews and otherwise investigating the facts of the case") (citing *Gupta*, 848 F. Supp. 2d at 495).

Courts presiding over insider trading cases in this District have made clear that the USAO cannot avoid its discovery obligations by pointing to immaterial or "unrealistic" distinctions between the fact-gathering efforts of the USAO and SEC.  *Gupta*, 848 F. Supp. 2d at 493 (internal quotations omitted).  For example, in *Gupta*, Judge Rakoff held that a joint investigation had been conducted where the USAO and SEC jointly interviewed many but not all of the witnesses and where the SEC attorney "frequently consulted with AUSAs" about interview memoranda he was preparing.  848 F. Supp. 2d. at 494-95; *accord United States v. Prange*, 11 Cr. 10415 (NMG),

2012 WL 3263606, at *1 (D. Mass. Aug. 7, 2012) ("In light of the reasonable inference suggested by the nature of the investigation that the SEC played a role in some aspects of the investigation, the Government shall review and produce the discoverable information possessed by the SEC regarding the confidential witness.").

In *Martoma*, Judge Gardephe found a joint investigation where (i) "representatives" of the USAO "conferred with the SEC about the SEC's parallel investigation;" (ii) the SEC and USAO jointly conducted many of the witness interviews; (iii) the SEC provided the USAO with documents obtained during the SEC's investigation; (iv) the underlying criminal complaint "expressly acknowledge[d] the SEC's participation in this fact gathering, stating that it is based, in part, on 'information received from the [SEC]'"; and (v) even where USAO representatives did not attend witness depositions, the SEC provided "update[s]" to the USAO on the testimony being taken.  990 F. Supp. 2d at 461.

### C.    Discussion

Here, as in *Gupta* and *Martoma*, the fact-gathering efforts of the FBI, SEC, and USAO plainly reflect a joint investigation for *Brady* and *Giglio* purposes.  The facts set forth above fall squarely within those previously held to give rise to a finding of a joint investigation.  Indeed, they are even more compelling.

Unique to this matter, there are multiple express affirmations of joint fact-gathering in the sworn affidavits and charging documents in the civil and criminal cases.  *First*, in connection with the preparation of the February Affidavit, the FBI affirmatively consulted with SEC attorneys and expressly relied upon documents provided by the SEC, including trading records and IP records, as well as the SEC's analysis of trading records to obtain the NDCA Warrant for Mr. Yin's phone. (Goldstein Decl. Ex. I, Aff. of SA Walthers ¶¶ 4, 7, 8, 9, Feb. 1, 2017.).  *Second*, when the SEC filed its initial complaint, the SEC expressly relied on evidence obtained from the FBI's search of

Mr. Yin's phone as well as the agents' interview of Mr. Yin.  (Goldstein Decl. Ex. J, SEC Compl. ¶¶ 4, 155-57.)  Thereafter, the evidence obtained by the FBI was also used by the SEC to obtain an asset freeze on Mr. Yin's bank accounts.  (Goldstein Decl. Ex. K, SEC's Mem. of Law.)  *Third*, the addition of insider trading charges in Lattice stock, which were included in the SEC's Amended Complaint, as well as the identification of Mr. Chow as "the Canyon Bridge Insider," clearly evolved from the review of evidence such as WeChats obtained by the FBI from Mr. Yin's cellphone.  (Goldstein Decl. Ex. L, SEC Am. Compl. ¶¶ 157, 158, 161, 163, 164, 170, 172-75, 215, 292).  *Fourth*, the SDNY Warrant for the search of Mr. Yin's cellphone was obtained following the FBI agent's "conversations with representatives from the [SEC]."  (Goldstein Decl. Ex. M, Aff. of SA Walthers ¶ 2, July 28, 2017).  *Fifth*, the Complaint in this matter averred that in preparing the affidavit, the FBI agent relied upon "documents and information provided to [him] by the [SEC]."  Crim. Compl. ¶ 11 & n.1, ECF No. 1.

Thus, the under-oath record is clear that at every stage of the investigation, the criminal and civil authorities conferred with one another, developed evidence, shared it with each other, and collectively built their cases through an extraordinary "degree of cooperation between agencies."  *Martoma*, 990 F. Supp. 2d at 461.  To highlight but a few examples:  the data obtained from the search of Mr. Yin's cellphone and Mr. Yin's statements to FBI agents were incorporated in every affidavit and charging instrument by the SEC and USAO that followed the initial search.  This evidence was obtained by the FBI in express reliance on the work of the SEC attorneys to date.  Likewise, the documents gathered by the SEC were not only shared with the USAO, but also have formed the common core of both the SEC's allegations against Mr. Yin as well as the USAO's allegations against Mr. Chow.  At the conclusion of the investigation, the USAO officially thanked

the SEC for its assistance; the SEC continues to apprise the court overseeing the SEC Action of developments in the criminal case.

The implications of this joint investigation are clear: the USAO must review the SEC's investigative file to search for and produce *Brady* and *Giglio* materials related to Mr. Chow. This is especially critical given that Mr. Chow has *already* identified extensive *Brady* material in the discovery generated by this joint investigation. Additional information similarly bearing on Mr. Yin's knowledge of any potential deals involving Lattice during the relevant period—including what Mr. Yin learned, who he learned it from other than Mr. Chow, and when he learned it— would likewise constitute *Brady* material, and is critical to Mr. Chow's ability to defend against the USAO's charges.

While not relevant to the legal question of whether a joint investigation existed, the USAO should not be permitted to avoid its obligations based on any claim that the government has a practice of declining to take possession of the SEC's investigative files in ongoing matters. It would certainly create perverse incentives for the USAO to be able to disclaim *Brady* and/or *Giglio* obligations by virtue of being able to selectively take into its physical possession some materials from the SEC's files but not others.[12] That is especially true in a case such as this, where the asymmetry in the charges between criminal and civil authorities suggests that the SEC is in possession of *Brady* material which informed the decision to charge Mr. Yin but not Mr. Chow.

---

[12] *Cf. Martoma*, 990 F. Supp. 2d at 460 (noting that the joint investigation inquiry does not turn on "whether the United States Attorney's Office physically possesses the discovery material") (quoting *United States v. Upton*, 856 F. Supp. 727, 750 (E.D.N.Y. 1994)); *United States v. Giffen*, 379 F. Supp. 2d 337, 342 (S.D.N.Y. 2004) (a prosecutor cannot "avoid disclosures of evidence by the simple expedient of leaving relevant evidence to repose in the hands of another agency while utilizing his access to it in preparing his case for trial") (internal quotations omitted).

## **CONCLUSION**

For the foregoing reasons, we respectfully request that this Court grant Defendant's pre-trial motions as set forth above.

Dated:   December 22, 2017          Respectfully submitted,
       New York, New York

                                 /s/
                                 George S. Canellos
                                 Katherine R. Goldstein
                                 Adam Fee
                                 MILBANK, TWEED, HADLEY & McCLOY LLP
                                 28 Liberty Street
                                 New York, New York 10005-1413

                                 *Counsel for Defendant Benjamin Chow*