# MILBANK, TWEED, HADLEY & MᶜCLOY LLP

**28 LIBERTY STREET**
**NEW YORK, N.Y. 10005-1413**

George S. Canellos
Partner
DIRECT DIAL NUMBER
+1 (212) 530-5792
E-MAIL: gcanellos@milbank.com:

April 14, 2018

**VIA ECF**

Honorable Gregory H. Woods
United States District Court
Daniel Patrick Moynihan United States Courthouse
500 Pearl St.
New York, NY 10007-1312

Re:     *United States v. Benjamin Chow*, 17 Cr. 667 (GHW)

Dear Judge Woods:

As we said we would do, we have reviewed the declaration of Shaohua "Michael" Yin that both parties received on April 11, 2017 (the "Yin Declaration") to determine whether to offer all or part of the declaration in evidence. A copy of the Yin Declaration is attached as Exhibit A. We now write to advise the Court that we intend to offer the declaration pursuant to Rule 806 as impeachment of out-of-court declarations of Mr. Yin that the Government has offered for their truth, including Mr. Yin's statements to daishiping001 on September 16, 2016 that "[a] friend of mine recently said that LSCC's project is moving forward," that "[i]t looks like it is a buyer related to the big fund," and that "if quick, there would be intentions by mid-October." *See* GX 1007T. We also respond to various claims made in a letter dated April 13, 2018 (the "April 13 Letter") that the government submitted to Your Honor with respect to the Yin Declaration.

As explained below, the Yin Declaration is plainly inconsistent with the out-of-court statements of Mr. Yin that the Government has offered for their truth, without affording the defendant any opportunity to confront and cross-examine Mr. Yin. When such purported co-conspirator statements are offered for their truth, Rule 806 of the Federal Rules of Evidence authorizes the admission of "evidence of the declarant's inconsistent statement or conduct, regardless of when it occurred or whether the declarant had an opportunity to explain or deny it." Fed. R. Evid. 806. Numerous courts have considered whether statements such as those in the Yin Declaration are admissible under Rule 806 and all have concluded that the statements must be admitted in evidence. Indeed, in published decisions that the government fails to cite in its April 13 Letter, the Courts of Appeals for the Third and Eleventh Circuits have reversed convictions for failure to admit out-of-court statements that are closely comparable to those contained in the Yin Declaration.

## A.     The Defendant's Offer of the Yin Declaration is Procedurally Proper

As your Honor is aware from the evidence at trial, Michael Yin was stopped by the FBI on February 3, 2017 while in transit through the airport in California. He was interviewed for more than two hours and allowed to return home to Beijing, China. Although the United States has a Mutual Legal Assistance Treaty with China, the government appears to have made no effort since

Hon. Gregory H. Woods
April 14, 2018
Page 2

February 3, 2017 to question Mr. Yin or secure his testimony at this trial. Instead, the government seeks to offer Mr. Yin's out-of-court statements — including his casual statements to friends and acquaintances — for their truth, thereby depriving Mr. Chow of the ability to confront and cross-examine a critical witness.

The government knows nothing about the circumstances of the preparation of the Yin Declaration; has no basis to question the authenticity of the Yin Declaration (which can be easily authenticated by Yin's counsel); and lacks any knowledge of the role of defense counsel in securing the Yin Declaration. Yet the government devotes the first three pages of the April 13 Letter to imagining the history of the Yin Declaration and attempting to suggest that defense counsel engaged in some form of impropriety. The government concludes by requesting "that defense counsel be required to provide a detailed chronology of their communications with Yin and Yin's counsel, so that the Court can evaluate whether the defendant has complied in good faith with the pre-trial schedule, the protective order, and the draft transcript stipulation." April 13 Letter at 3. These claims are meritless. The government fails to cite any law or rule that has been violated by any party; fails to cite any case giving the government authority for its request; and fails to articulate any basis for intruding on constitutionally protected information about the defendant's investigation and strategy.

As a threshold matter, we note that defense counsel has an ***obligation*** under the Sixth Amendment to conduct a reasonable investigation of the facts pertaining to the charges against their client, including seeking to interview key witnesses.[1] Defense counsel also has a ***right*** to unfettered access to witnesses that is guaranteed by the Due Process Clause.[2] The right to secure and present evidence from those witnesses is also a fundamental element of due process. *See Washington v. Texas*, 388 U.S. 14, 19 (1967). It should come as no surprise, therefore, that defense counsel sought to contact Mr. Yin's counsel, learn what testimony Mr. Yin could provide, and secure favorable testimony or declarations from Mr. Yin. *See* Exhibit A at ¶ 5. These are constitutionally encouraged and protected activities, not procedurally improper "gamesmanship." *See* April 13 Letter at 2.

None of the government's specific complaints about "gamesmanship" have any validity or relevance. For example, the government states that, "despite counsel's repeated assertions that Yin is the 'most important witness' in this case (Tr. 515), at no time has the defendant taken meaningful steps to secure Yin's (self-serving) testimony." *Id*. But the government has no knowledge of whether, when or how defense counsel has been seeking Mr. Yin's testimony. Moreover, this

---

[1] *See, e.g., Strickland v. Washington*, 466 U.S. 668, 690–91 (1984) ("counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary").

[2] *See, e.g., United States v. Walton*, 602 F.2d 1176, 1179–80 (4th Cir. 1979) ("[a] witness is not the exclusive properly of either the government or a defendant; a defendant is entitled to have access to any prospective witness, although in the end the witness may refuse to be interviewed."); *United States v. Peter Kiewit Sons' Co.*, 655 F. Supp. 73, 77 (D. Colo. 1986) ("the right of the defense to have access to witnesses in a criminal case should be unfettered and free of government intervention"); ABA Criminal Justice Standards for the Prosecution Function 3–3.4(h) ("The prosecutor should not discourage or obstruct communication between witnesses and the defense counsel ….").

Hon. Gregory H. Woods
April 14, 2018
Page 3

question has no bearing on the admissibility of the Yin Declaration since the admissibility of impeachment evidence under Rule 806 does not turn on whether the witness is available.

Similarly, the government asserts that it is "evident" that defense counsel was "intimately involved in the creation of the Declaration." *Id.* If it were true, there would certainly be nothing wrong with counsel for the defendant seeking to secure favorable declarations or testimony from the primary declarant/witness for the prosecution. But the government knows nothing about how the Yin Declaration was prepared. Moreover, this question has no bearing on the admissibility of the Yin Declaration since statements admitted under Rule 801(d)(2)(E) may be impeached by inconsistent statements that are either made or adopted by the out-of-court declarant. Indeed, almost all conventional impeachment of witnesses is conducted by leading questions put to the witness for affirmation or adoption. *See, e.g.*, Fed. R. Evid. 611(c)(1) (providing that ordinarily the court should allow leading questions on cross-examination).

With no apparent irony, the government also claims that the statements in the Yin Declaration are "unverifiable and self-serving statements of a man who remains on the other side of the Earth." April 13 Letter at 3. Of course, it is ***the government*** that is offering for their truth Mr. Yin's unverifiable and self-serving statements to various friends and acquaintances, placing the defendant in the position of having to impeach those statements without the ability to call and cross-examine Mr. Yin himself. It is for precisely this reason that Rule 806 authorizes the use of out-of-court statements of the same declarant to impeach those offered by the government. *See* Fed. R. Evid. 806, adv. comm. notes ("The declarant of a hearsay statement which is admitted in evidence is in effect a witness. His credibility should in fairness be subject to impeachment and support as though he had in fact testified."). As we intend to argue to the jury if the Yin Declaration is admitted, the statements in the Yin Declaration are more credible than Mr. Yin's casual lies to acquaintances since the statements were made under penalty of perjury by an individual who was represented by counsel and not required to make any statement at all.

The government attempts to suggest that the Yin Declaration is untimely. Employing feigned indignation, the authors of the April 13 Letter go so far as to assert that "the defendant has played coy with the Government and with the Court" and "flagrantly disregarded the Court's pretrial schedule." April 3 Letter at 3. These are strong words to use when the government fails to offer a single fact in support of either claim. Defense counsel received the Yin Declaration at the same time as the government. Just as importantly, the defendant has no obligation to provide any information to the government about its investigation of the facts, interviews of potential witnesses, or conversations with potential witnesses' counsel. Under the terms of Your Honor's scheduling order, moreover, the defense has no obligation to provide any impeachment material to the government at any time.

The government also continues to sound the theme that the defense counsel may have violated the protective order covering discovery materials in this case by impermissibly supplying such materials to Mr. Yin's counsel. This claim is easily refuted.

First, consistent with the defendant's constitutional right to unfettered fact-finding, the protective order expressly authorizes defense counsel to supply such materials to "prospective witnesses, and their counsel, to the extent deemed necessary by defense counsel, for the purposes of the criminal proceedings in this case." Dkt. 23, Protective Order ¶ 2(c)(3). Although "prospective

Hon. Gregory H. Woods
April 14, 2018
Page 4

witness" is not defined in the protective order, Mr. Yin qualifies as one under any possible definition. That would be true even if defense counsel's only goal were to secure an affidavit or declaration of Mr. Yin. *See, e.g.,* Fed. R. Evid. 806, adv. comm. notes (noting that a "declarant of a hearsay statement which is admitted in evidence is in effect a witness"); *Crawford v. Washington*, 541 U.S. 36, 51 (2004) (holding that an out-of-court declarant qualifies as a "witness" against the accused under the Confrontation Clause; noting that the Confrontation Clause applies to "'witnesses' against the accused — in other words, those who 'bear testimony" — and that "'[t]estimony' . . . is typically '[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact'") (citations omitted).

Second, the materials provided to Mr. Yin's counsel were marked as government exhibits and will be received in some form in evidence by stipulation. Thus, there was no expectations of confidentiality surrounding these materials.

Third, the exhibits entirely consist of chats taken from Mr. Yin's own telephone, and translations thereof. The telephone was returned to Mr. Yin by the FBI many months ago. Accordingly, Mr. Yin and his counsel were already in possession of the communications in question.

Finally, in light of the April 13 Letter, the Court should be aware of additional procedural context for the government's accusations of "gamesmanship."

First, shortly before midnight on Friday, April 6, less than three days prior to the start of trial, the government delivered to Mr. Chow the contents of a laptop belonging to Michael Yin (the "Yin Laptop") that the SEC had received approximately one week earlier from authorities in Hong Kong. Just one day earlier, on Thursday, April 5, the government first informed Mr. Chow of the existence of the Yin Laptop, reporting that it had been the subject of a SEC request to Hong Kong authorities that had been pending for approximately one year and which sought information from Mr. Yin's former Hong Kong-based employer, Summitview Capital. In the same call informing the defense of the existence of the Yin Laptop, the government announced that it would oppose any defense request for an adjournment of the trial.

The defense worked over the ensuing weekend, and has continued to work through today, to examine the contents of the Yin Laptop. It contains approximately 35 gigabytes of data, including more than 180,000 documents, of which more than 40,000 contain Chinese characters. Despite the delivery of these materials only days before trial, and the prospect of a lengthy review of the laptop to search for *Brady* and other relevant materials, Mr. Chow did not complain to the government or Court, and did not seek to adjourn the trial. The defense has instead quietly undertaken a review of thousands of Chinese- and English-language materials from the laptop, while simultaneously litigating this trial. And as a result of that review, we can report that we have, in fact, found *Brady* material on the Yin Laptop — consisting of additional communications by Michael Yin gathering information about Lattice from individuals other than Mr. Chow — which we will be offering at trial this week.

Hon. Gregory H. Woods
April 14, 2018
Page 5

Second, during just the three weeks preceding the start of trial on April 9, 2018, the government produced to the defense more than 8,300 documents as new Rule 16 discovery. Mr. Chow did not lodge a complaint with the government or the court, and never sought to preclude any materials from being used at trial as the result of their disclosure beyond the time when Rule 16 discovery would typically be produced.

Third, it bears noting that, throughout this case and continuing to today, the government has failed to identify a single piece of *Brady* material in any of the materials delivered to Mr. Chow. This is despite its recent concession in its April 9, 2018 letter that the communications marked as DX 301T, 504, and 801T-804T, are admissible impeachment evidence that tends to exculpate Mr. Chow, and the existence of the other *Brady* material identified on Mr. Yin's phone and laptop. *See* Dkt. 101 ("April 9 Letter") at 1.

While these events required the defense to adjust, and re-adjust, how it was spending its time in the weeks and days leading up to trial, the defense did not raise complaints with the Court, and going forward, it will continue to focus its efforts on mounting a defense to the allegations against Mr. Chow.

## B.   <u>The Yin Declaration is Admissible Under Rule 806</u>

### 1.   The Government's Proffered Messages

The government has conceded that Rule 806 permits the admission of certain of Mr. Yin's statements for the purpose of impeaching the credibility of Mr. Yin. *See id*. This is because the government seeks to offer at least two of Mr. Yin's statements for their truth, and the defense submits that a third set of Mr. Yin's statements is also being offered for its truth (collectively, the "Proffered Messages").

First, the government seeks to offer a September 16, 2016 exchange between Mr. Yin and a WeChat user who is identified by the user name "daishiping001" (the "September 16 Exchange"):

| | |
|---|---|
| Mr. Yin: | A friend of mine recently said that LSCC's project is moving forward, do you have any understanding? |
| daishiping001 (steve): | I'll ask |
| Mr. Yin: | It looks like it is a buyer related to the big fund. If quick, there would be intentions by mid-October |

(GX 1007T). The government will argue "that the 'friend' in question is [Mr. Chow]" and that this exchange corroborates the government's argument that Mr. Yin was tipped by Mr. Chow. April 7 Letter at 3.

Hon. Gregory H. Woods
April 14, 2018
Page 6

Second, in its letter filed on April 13, 2018, the government has stated, for the first time, that it now seeks to offer a second statement of Mr. Yin's for its truth — an October 17, 2016 exchange between Mr. Yin and a WeChat user who is identified by the user name "luckiman (Fang)" (the "October 17 Exchange"):

| Mr. Yin: | Do you have a heavy overseas stock position right now? |
| luckiman (Fang): | 2/3 |
| Mr. Yin: | It is okay, depends on what stocks they are. Buy 25,000 shares of LSCC (change position, or use the remaining 1/3, either one is okay). $15,000 position, I will help take this risk for you |

(GX 1006T, at 1).

Third, while the government has not commented upon the purpose for which it is offering Mr. Yin's statements in two successive audio messages he sent to Mr. Chow on September 21, 2016, the messages appear to be relevant only if offered, at least in part, for their truth (the "September 21 Exchange"):

| Mr. Yin: | Um, I heard from a Banker today, um, that, that is the company that does FPGA, um— |
| Mr. Yin: | Ah, their management level, ah, with China, with regards to, there is still considerable concern with regards to CFIUS. If they have any other option, they may not even consider the Chinese buyer, ah, you may be mentally prepared for it. |
| Mr. Chow: | Ah, (UI), right now we are over at this (UI) company, we should already be signing the contract soon. Ai— |

(GX 1003T, at 9).

**2.  Michael Yin's Sworn Declaration**

In Mr. Yin's sworn declaration, he described his understanding of certain of the government's allegations in the case, and contradicted the government's claims about the existence of the conspiracy and Mr. Chow's involvement in it:

Hon. Gregory H. Woods
April 14, 2018
Page 7

- Mr. Yin stated that, in the conversation marked as GX 1007T, he was speaking with an investor named "Steven Dai"; he falsely said that a "friend" told him about the "LSCC project" going forward; and he chose to falsely characterize his own belief that Lattice was a "possible take-over candidate" as coming from a "friend" in order to prompt Mr. Dai to share information with him.  (Ex. A ¶¶ 3-5.)

- Mr. Yin further stated that, in the conversation marked as GX 1003T and involving him and Mr. Chow, he was not referring to Lattice when he mentioned an "FPGA" company; and that Mr. Chow had not previously told Mr. Yin the name of any company that he was considering acquiring, or anything about the "terms or timing" of a possible acquisition, but had only identified his interest "in possibly acquiring a FPGA company."  (Ex. A ¶¶ 6-8.)

- Mr. Yin also stated that, while he has not been contacted by the government since his encounter at the San Jose Airport on February 3, 2017, he would have provided this same information to the government if government agents had elected to contact Mr. Yin or his counsel.  (Ex. A ¶ 9.)

**3.      Discussion**

In its letter brief, the government devotes two paragraphs to establishing the proposition that the Yin Declaration is not admissible under Rule 806, citing only two inapposite cases that address Rule 806, and failing to address the relevant authorities on this subject.  On this basis, the government argues that the court should apply a rule that appears to presuppose the outcome of this trial — namely, that "absent members of a scheme should not be permitted to 'gin up' exculpatory explanations for prior statements and put them before a jury to aid a confederate."  April 7 Letter at 4.

We are confident that the Court's review of the relevant authorities will yield a different conclusion:  Every federal court that has considered similar facts as those found here has ruled in favor of Mr. Chow's position, including two squarely applicable circuit court decisions and one trial court in this District.  *See United States v. Grant*, 256 F.3d 1146, 1154-55 (11th Cir. 2001) (reversing trial conviction based on improper exclusion of absent co-conspirator's exculpatory sworn statements offered for impeachment purposes); *United States v. Wali*, 860 F.2d 588, 590-91 (3rd Cir. 1988) (reversing trial conviction based on improper exclusion of absent co-conspirator's exculpatory statements to law enforcement offered for impeachment purposes); *United States v. Shafi*, No. 92 Cr. 274 (LMM), 1993 WL 14483, at *1 (S.D.N.Y. Jan. 11, 1993) (*Shafi I*) (unavailable coconspirator's exculpatory statements admissible under Rule 806 to impeach coconspirator's inculpatory statements); *United States v. Shafi*, No. 92 CR. 274 (LMM), 1993 WL 17015, at *2 (S.D.N.Y. Jan. 15, 1993) (*Shafi II*) (granting government's motion for reconsideration, and affirming the original ruling in *Shafi I*).

Hon. Gregory H. Woods
April 14, 2018
Page 8

Consistent with these authorities, the entirety of the Yin Declaration is admissible both to impeach the specific factual assertions in the Proffered Messages, but also because its contents would undoubtedly be admissible to impeach the existence of the conspiracy had the proffered co-conspirator statements of Mr. Yin "been delivered from the witness stand by the co-conspirator himself, not as hearsay about what he said during the conspiracy." *Grant*, 256 F.3d at 1154-55 ("The statements in [the absent coconspirator's] affidavit were inconsistent with the existence of any conspiracy at all, and for that reason were inconsistent with his coconspirator statements"); *accord Wali*, 860 F.2d at 591 ("Even though [the declarant's proffered coconspirator statements] never stated that Wali was the 'Hadji' who supplied him with narcotics, the government used his co-conspirator statements to show that they were made in furtherance of a conspiracy to import drugs, thereby inculpating Wali. Thus, [the declarant's] statements to Dutch authorities that exculpated Wali were inconsistent."), *and Shafi I*, 1993 WL 14483, at *1 (holding that the exculpatory statements of the declarant are admissible as impeachment under Rule 806 where the government offered the declarant's statements in order to "show the existence of a conspiracy").

Indeed, unlike the proffered statements in the two cases cited by the government, the Yin Declaration is plainly "inconsistent" with the Proffered Messages, and directly impeaches the credibility of the declarant, whose statements the government relies on to establish the existence of the conspiracy. *Cf. United States v. Hunt*, 521 F.3d 636, 644 (6th Cir. 2008) (in *dicta*, observing that the proffered statements were inadmissible under Rule 806 "because there does not appear to be any inconsistency") (emphasis added); *United States v. Rodriguez*, 259 F. App'x 270, 275 (11th Cir. 2007) ("The affidavits do not attack the credibility of either [of the declarants] as Rule 806 would require.").

First, Mr. Yin's statement on September 16 that "a friend of mine told me the LSCC project is going forward" is being offered not only to prove (1) that Mr. Chow was the "friend" but also to prove (2) the existence of a conspiracy—*i.e.*, that Mr. Yin and some other person are engaged in a conspiracy to gather inside information on Lattice and its sale process (the "project").

Second, Mr. Yin's statement on October 17 that "I will help take this risk for you" is being offered not only to prove (1) that Mr. Yin planned to assume the risk of any trades made in Lattice by the other speaker but also to prove (2) the existence of a conspiracy that involved Mr. Yin and others seeking to trade in Lattice on the basis of inside information, which the government claims was obtained by Mr. Yin from Mr. Chow.

Third, Mr. Yin's statements on September 21 that he "heard from a Banker" about "the company that does FPGA" being wary of engaging with a "Chinese buyer" due to CFIUS risk are being offered not only to prove (1) that Mr. Yin heard from a banker about Lattice expressing concerns about CFIUS and a Chinese buyer, which he then relayed to Mr. Chow, but also to prove (2) the existence of a conspiracy involving Mr. Yin and Mr. Chow, which involved gathering and sharing with one another information about Lattice.

Given the clear contradiction between the Proffered Messages and the Yin Declaration, this case falls within the framework of *Grant* and *Wali*, both of which held that the exculpatory statements of coconspirators should be admitted under Rule 806 for impeachment purposes where the same declarant's out-of-court statements are being offered to inculpate the defendant. The two

Hon. Gregory H. Woods
April 14, 2018
Page 9

cases offer well-reasoned analyses of exactly the question before this Court, and the holdings, which favor Mr. Chow's position, remain uncontroverted by any case addressing similar facts.

In *Grant*, the Eleventh Circuit reversed the district court's exclusion of an inconsistent statement under Rule 806, observing that the "government's conception of inconsistency is too narrow." 256 F.3d at 1153. The government charged Grant in a narcotics conspiracy, and offered the statements of his alleged co-conspirator to establish the existence of the alleged conspiracy. "The government attempted to avoid Rule 806 by carefully ensuring that" the agent through whom the co-conspirator's statements were admitted "never specifically identified Grant as [his] co-conspirator, at least on direct examination, and then presenting other evidence indicating that Grant was [his] co-conspirator." *Id*. at 1153. Grant sought to impeach the co-conspirator's statements with an affidavit obtained from the alleged coconspirator, executed after the conspiracy ended and following his deportation to Jamaica, in which the alleged coconspirator disavowed Grant's participation in the conspiracy.

The district court excluded the affidavit, finding it not inconsistent with the co-conspirator's statements introduced at trial. The Eleventh Circuit reversed, noting that "[t]he Rule 806 test is not whether the inconsistent statements relate to the identity of co-conspirators; that's not what the Rule says. Instead, it says that 'any' evidence is admissible 'which would be admissible . . . if [the] declarant had testified as a witness' from the stand." *Id*. at 1154 (quoting Fed. R. Evid. 806). If the declarant "had been called as a witness and testified, for example, that he was taking the cocaine he was buying to his partner to test and evaluate it, his affidavit statements indicating that he had lied to the agents when he told them he had a partner would surely be admissible." *Id*. Likewise, the court explained, "if [the declarant] had testified and during cross-examination had said that Grant did not want to meet with anyone, his affidavit statement that he had lied about that would be admissible to impeach him." *Id*.

So too here. The government seeks to use Mr. Yin's statements to establish the existence of the charged conspiracy and to prove that Mr. Chow was a member of that conspiracy who provided information to Mr. Yin ("a friend") and obtained helpful intelligence from him ("the company that does FPGA … there is still considerable concern"). The entirety of the Yin Declaration is, as in *Grant*, "inconsistent with the existence of any conspiracy at all, and for that reason [is] inconsistent with his co-conspirator's statements." *Id*. at 1155. The Yin Declaration also directly addresses and contradicts the out-of-court declarations that the government seeks to offer for their truth, acknowledging that he had heard nothing from Mr. Chow or any friend about the progress of the Lattice deal and had no inside information about Lattice.

*Wali* is also squarely applicable here. In *Wali*, the government offered an alleged coconspirator's statements via the testimony of an undercover DEA agent, who described the declarant's statements identifying an individual known as "Hadji" as the source of the drugs involved in the charged narcotics conspiracy. 860 F.2d at 589. Wali sought to impeach the declarant's credibility by offering inconsistent statements the declarant had later made during interviews with law enforcement that exculpated Wali. The government argued that the declarant's later statements were not inconsistent and therefore not admissible pursuant to Rule 806, because the statements proffered by the government never identified Wali as "either the source of his narcotics or the 'Hadji' who supplied him." Id. at 591. In rejecting the government's argument, the Third Circuit held that because the government had used the declarant's co-conspirator statements to "show that they

Hon. Gregory H. Woods
April 14, 2018
Page 10

were made in furtherance of a conspiracy to import drugs, thereby inculpating Wali," the proffered exculpatory statements were "inconsistent" and admissible under Rule 806. *See id.* at 591.

The court in *Wali* also considered and rejected the government's argument that Rule 806 should not apply because the defendant's "decision not to depose [the declarant] before trial was clearly strategic since [the declarant's] exculpatory statements at a deposition would have been subject to cross-examination." *Id.* at 590. The court held that Rule 806 is simply unconnected to the question of what opportunities the defense may have taken or not taken to otherwise obtain the in-court testimony of the declarant:

> [T]he government asserts that '[t]he defendant's decision to forego the dep-
> osition and attempt to introduce the unexamined statements at trial does not
> entitle him to a new trial.' However, the crux of the issue in this case is not
> whether a defendant . . . had available to him a means of deposing or sub-
> poenaing witnesses that he failed to utilize, but whether when the govern-
> ment has used statements of an alleged co-conspirator, can a defendant ad-
> mit exculpatory statements of that alleged co-conspirator for the purposes
> of impeachment under Rule 806. As stated in Rule 806, there is no require-
> ment that the hearsay declarant, whose inconsistent statements are used
> against him for purposes of impeachment, have been afforded an oppor-
> tunity to deny or explain these statements. Therefore, [the declarant's] state-
> ments that exculpated Wali, if inconsistent with his co-conspirator state-
> ments that inculpated Wali, can be admitted pursuant to Rule 806 without
> any need for cross-examination and regardless of whether [the declarant]
> could have been deposed.

*Wali*, 860 F.2d at 591 (internal citations omitted). Any suggestion that admission under Rule 806 could be precluded as the result of a party forgoing opportunities to obtain live witness testimony would run counter to the text of Rule 806 and the advisory committee notes. *See* Fed. R. Evid. 806, adv. comm. notes.

Similarly, here, the government's suggestion that the steps purportedly not taken by the defense to secure Mr. Yin's testimony preclude admission under Rule 806 is simply not relevant to the Court's analysis. On its face, Rule 806 permits the admission of "any evidence" that could be used to impeach a witness, "regardless of when it occurred or whether the declarant had an opportunity to explain or deny it." Fed. R. Evid. 806. And that makes sense: Rule 806 is a necessary counterbalance to the extraordinarily broad and impactful coconspirator exclusion from the rule against hearsay. To argue that it would be unfair or prejudicial to admit the declarant's out-of-court statements under Rule 806 overlooks the fact that any materials admitted under Rule 806 are offered only to impeach out-of-court statements already offered for their truth without being tested by defense cross-examination. As the district court noted in *Shafi II*:

> A statement admitted pursuant to Rule 801(d)(2)E), while by that rule de-
> fined not to be hearsay, nevertheless presents the problem that hearsay does,
> that the declarant is not available to be cross-examined. Underlying Rule
> 806 is the thought, as expressed by the Advisory Committee, that "[t]he

Hon. Gregory H. Woods
April 14, 2018
Page 11

> declarant of a hearsay statement [of which, for present purposes, a conspirator's statement is the equivalent] which is admitted in evidence is in effect a witness. His credibility should in fairness be subject to impeachment and support as though he had in fact testified.

*Shafi II*, 1993 WL 17015, at *2.

Respectfully submitted,

/s/ _____
George S. Canellos
Katherine R. Goldstein
Adam Fee

cc:   AUSA Elisha Kobre (via ECF)
      AUSA Scott Hartman (via ECF)
      AUSA Max Nicholas (via ECF)