# MILBANK, TWEED, HADLEY & M<sup>c</sup>CLOY LLP

**28 LIBERTY STREET**
**NEW YORK, N.Y. 10005-1413**

Katherine R. Goldstein
Partner
DIRECT DIAL NUMBER
+1 (212) 530-5138
E-MAIL: kgoldstein@milbank.com

December 31, 2018

<u>VIA ECF</u>

Honorable Gregory H. Woods
United States District Court
Daniel Patrick Moynihan United States Courthouse
500 Pearl St.
New York, NY 10007-1312

    Re: *United States v. Benjamin Chow*, 17 Cr. 667 (GHW)

Dear Judge Woods:

    Mr. Chow respectfully submits this letter brief to address certain of the arguments made by the government in its sentencing memorandum ("Gov't Mem.").

## I.   The Government's Guidelines Analysis Is Unsupportable

    The government's arguments about the proper application of the Sentencing Guidelines are misplaced.

### A.   The Entirety Of Michael Yin's Gain Is Not Properly Attributable To Mr. Chow

    First, the government argues that because Mr. Chow was convicted of a conspiracy from March 2016 through November 2016, and a scheme to defraud over the same time period, that he should be held accountable for all the trading gains made by Michael Yin irrespective of the six counts of acquittal. This argument is incorrect.

    The convictions on the substantive counts do not necessarily suggest that the jury found that the conspiracy ran for the entirety of the charged time period. The government ignores the fact that the jury was instructed on the conspiracy count that "it is ***not necessary*** for the government to prove that the conspiracy lasted throughout the entire time period alleged but only that it existed ***for some period within that timeframe***." Tr. 1516-17 (emphasis added). Thus, the jury could have convicted Mr. Chow of conspiracy for entering into a criminal agreement with Mr. Yin at any point in time.

By contrast, the six acquittals on substantive counts clearly reflect that the jury concluded that Mr. Chow and Mr. Yin were not in a conspiracy at least as to the trades related to those six counts. And simply excluding trading gains from two of those counts – concerning Mr. Yin's trades on November 1 and 2, 2016 – yields a gain amount of less than $3.5 million.

But ***even if*** the evidence showed that Messrs. Chow and Yin remained in a conspiracy for all of the charged period, as the government contends, the trading at issue in the acquitted counts could not have been a part of the charged conspiracy. Where the jury acquitted Mr. Chow of certain counts, it must mean that the jury concluded that Mr. Yin traded ***on the basis of information he obtained from elsewhere***. Indeed, the trades very well could have been part of ***another*** conspiracy between Mr. Yin and someone else.

Accordingly, Mr. Chow should not be held responsible for Mr. Yin's gains on the trades for which he was acquitted despite the fact of the conspiracy conviction.

***Second***, the government urges the Court to include the gains from the acquitted counts as relevant conduct under U.S.S.G. § 1B1.3. The Court must make a finding by a preponderance of the evidence that the defendant committed the conduct at issue for each acquitted count. *United States v. Pica*, 692 F.3d 79, 88 (2d Cir. 2012). The government has failed to provide the Court with any of the requisite support from the record necessary to make this finding. The government simply asserts without citations to the record that it had to have been Mr. Chow who provided Mr. Yin with material non-public information.

As the Court knows, Mr. Yin himself supplied compelling evidence of Mr. Chow's innocence as late as November 1, 2016 in a telephone call with Da Peng Xu. In that call, Mr. Yin confirmed that Mr. Chow had discussed with him nothing more than that the "first objective" of Mr. Chow's fund was "to acquire an FPGA company," and Mr. Yin then asked Xu, "***I don't know, is it possible there is something going on?***" DX 801-T, 801A-E (emphasis added). As set forth in Mr. Chow's principal sentencing submission, there was also substantial evidence of alternative tippers and other sources of information on which Mr. Yin could have based his trades. *See* Def. Mem. at 12-13, 18. A fair view of the actual evidence presented at trial, as compared to the government's overwrought characterization of it, does not support the conclusion that the acquitted conduct was proved by a preponderance of the evidence. Accordingly, it should not be considered relevant conduct in calculating the applicable Guidelines range.

### B.   The Abuse of Trust Enhancement Is Unwarranted As A Matter Of Law

The government attempts to side-step the black letter law holding that there can be no abuse of trust arising from an arm's length contractual relationship by asserting that Lattice granted Mr. Chow the requisite discretion ***in the non-disclosure agreements*** themselves. *See* GX 848-849. The government's argument misunderstands the concept of "discretion" as it is used in the case law. Whether the abuse of trust enhancement applies is a legal question that the Second Circuit reviews *de novo*. *United States v. Huggins*, 844 F.3d 118, 124 (2d Cir. 2016).

As the Second Circuit has "repeatedly held," a "'position of trust' is held by one who was accorded discretion by the victim and abused a position of fiduciary or quasi-fiduciary status." *Huggins*, 844 F.3d at 124. Thus, the term "discretion" is typically associated with a power and informational imbalance, such as between an investment advisor and his clients, where one is obligated to act in the best interests of the other. *See id.* (noting that an abuse of trust is often found where the "defendant served as a financial adviser or had discretionary authority for the victim's financial portfolio"); *see also United States v. Rivernider*, 828 F.3d 91, 114 (2d Cir. 2016) (enhancement warranted where defendant "functioned essentially as an investment advisor for a number of victims"); *United States v. Hirsch*, 239 F.3d 221, 227 (2d Cir. 2001) (enhancement appropriate where defendant "concedes that there was a fiduciary relationship between him and his investors") (internal quotation marks omitted). While the case law does not ***require*** the existence of a fiduciary duty before imposing an abuse of trust enhancement, courts nonetheless look for the hallmarks of such a relationship.

While it may be theoretically possible that a contract negotiated at arm's length, like the NDAs, could confer the requisite discretion, the government does not cite to ***a single case*** in which the Second Circuit, or any Circuit for that matter, has found such discretion based solely on contractual language. But even if such a contract could conceivably be drafted, the NDAs at issue in this case were ***not*** such contracts.

As an initial matter, the NDAs were ***bilateral*** agreements – both sides negotiated at arm's length from similar positions of strength and imposed upon one another the very same set of contractual obligations. If the government's reading of the NDAs is correct, then both parties must have occupied positions of trust with respect to each other, in which case the government's Guidelines analysis makes no sense. The Guidelines make clear that the enhancement is meant to apply in circumstances in which the defendant and the victim are ***not*** on equal footing. *See United States v. Barrett*, 178 F.3d 643, 646 (2d Cir. 1999) ("[T]he defendant must have misused discretionary authority ***that the victim entrusted to him***.") (emphasis added) (citations omitted). In a bilateral agreement, each side equally reposes trust in the other. Moreover, the government's reading clearly contravenes the purpose of the abuse of trust enhancement, which is to punish more severely those whose "discretionary judgment [] is ordinarily given considerable deference." U.S.S.G. § 3B1.3 cmt. n. 1. Here, each party had the contractual authority to use confidential information for the same purposes under the same set of rules.

Thus, it is misleading to claim that Mr. Chow abused a position of trust because he was "entrusted" by Lattice with confidential information as "the managing partner of an investment firm with more than $1 billion in assets under management." Gov't Mem. at 12; *see also id.* at 13 ("Lattice ***gave*** Chow this discretion") (emphasis added). This case did not concern any information that Lattice gave to Mr. Chow or Canyon Bridge. As the testimony made clear, the idea for the acquisition of Lattice was entirely Mr. Chow's and the plan to effectuate it was also his. Accordingly, the government is wrong to analogize Mr. Chow to a "corporate president or an attorney who misused information regarding a planned but unannounced takeover attempt." *See id.* at 12 (quoting U.S.S.G. § 3B1.3 app. n. 2). The misappropriation from shareholders or from a client by one in possession of superior information or authority bears no relationship to this case, in which two parties negotiated with each other at arm's length and on similar footing. This distinction is decisive. *See United States v. Jolly*, 102 F.3d 46, 49-50 (2d Cir. 1996) (explaining

that, "in the typical case," the enhancement applies where "the victim is a business and the defendant is an employee who has taken advantage of the knowledge and responsibilities acquired by virtue of his or her position within the company or where a fiduciary or personal trust relationship exists," but not in "an arm's-length commercial relationship" which is "therefore not characterized by trust or freedom to commit difficult-to-detect wrongs.")

The government's efforts to distinguish *Huggins* and *Jolly* also fail. The government argues that "[t]hose cases involved plain misrepresentations about how investor money would be used, leaving no discretion to the defendant." Gov't Mem. at 14. But in both cases the defendants had entered into contractual agreements with their investors. The government never explains the difference between the contracts at issue in this case and those at issue in the others. This superficial analysis is due no weight.

The government's final argument – that the abuse of trust enhancement "would likely not apply, for example, to a secretary or clerical worker at Chow's firm" – exposes the fallacy of its logic. Gov't Mem. at 14. Presumably every employee at Canyon Bridge was bound by the NDA. It makes no sense to suggest that Mr. Chow had discretion under the NDA while another employee did not when all were bound by the same terms.

The government's abuse-of-trust argument should be rejected and, as set forth in Mr. Chow's principal sentencing submission, the properly calculated Guidelines range should be 51 to 63 months' imprisonment. *See* Def. Mem. at 16-22.

## II. The Section 3553(a) Factors Do Not Support A Guidelines Range Sentence

The government's sentencing submission fails to meaningfully engage with most of the Section 3553(a) factors at all. Instead, the government substitutes overheated rhetoric for clear-eyed analysis. Most egregiously, the government does not even acknowledge, must less grapple with, the Probation Department's recommendation that Mr. Chow receive a significant variance from the indicated Guidelines sentence.

### A. The Government Wholly Ignores The Issue Of Sentencing Disparities

The government's failure to assess the nature and circumstances of Mr. Chow's offense conduct, including his relative culpability as compared to other insider trading defendants in this District, is reflected in its recommendation that would result in Mr. Chow being sentenced to one of the longest prison terms ever imposed on an insider trading defendant in this District.

The government makes a handful of arguments in support of its position, none of which support its request for an extraordinarily punitive sentence.

The first – that Mr. Chow abused a position of trust (Gov't Mem. at 16) – should be rejected for the reasons set forth above.

The second argument – that Mr. Chow's provision of MNPI over a seven-month period of time makes Mr. Chow more deserving of serious punishment than many other insider trading defendants, including Rajat Gupta, who only passed "three tips over approximately 5 weeks" (Gov't Mem. at 16) – is flawed. The metric – length of time during which tips were provided – is

not a meaningful one and appears to have been arbitrarily selected. A far more common and useful measure of the seriousness of the crime is the number of quarters in which confidential financial information was disclosed or the number of deals around which the defendants traded. Certainly, a defendant who provides inside information over multiple quarters or about multiple deals is more culpable than one who provides information about a single quarter or transaction. Under this metric, Mr. Chow's offense is relatively discrete and he is far less culpable than other defendants, especially where the government's characterization of its evidence as proving a "nearly continuous flow of MNPI to Yin" from Mr. Chow (Gov't Mem. at 16) is contradicted by the actual texts offered at trial.

The government's citation to the *Gupta* case is also jarringly inapt. Gupta, who served on the Board of Directors of Goldman Sachs, tipped hedge fund founder Raj Rajaratnam around "momentous" quarterly events, including that "Warren Buffet planned to invest – in the midst of a financial crisis – $5 billion in Goldman Sachs two hours before that fact was announced to the public," and that Goldman's "fourth-quarter result would be a loss, though at that time, Wall Street analysts were projecting that Goldman – which since becoming a public company, had never reported a quarterly loss – would continue to report profits." *United States v. Gupta*, 111 F. Supp. 3d 557, 561 (S.D.N.Y. 2015) (internal quotation marks and citations omitted). By any reasonable measure, Mr. Chow's conduct is far less severe than Gupta's, who received a sentence of 24 months.

Third, the government claims that Mr. Chow deserves one of the most serious sentences ever meted out because he "tried to obstruct FINRA's investigation." Gov't. Mem. at 16. Mr. Chow has addressed this claim at length in other submissions. Suffice it to say that the conduct which the government views as obstructive in this case pales in comparison with conduct seen in other cases where purportedly obstructive conduct was taken into account at sentencing. But even if the conduct were considered obstructive, the government makes no effort to explain why the conduct in this case warrants a sentence so much more punitive than in other cases with comparably worse facts. *Cf. United States v. Stewart*, 15 Cr. 287 (LTS), ECF No. 234, Gov't Sentencing Mem. at 5; *Id.*, ECF No. 237, Judgment (defendant, who denied recognizing the name of his own father on a list of traders circulated by FINRA to defendant's employer, given a below-Guidelines sentence of 36 months).

Fourth, the government argues that Mr. Chow received personal benefits which "place him squarely within the mean of insiders who have been prosecuted in this District who tipped in exchange for similar consideration." Gov't. Mem. at 17. Again, the government's misleading comparison to *Gupta* cannot withstand scrutiny. The Second Circuit held that Gupta had a close personal relationship **and** a financial relationship with Raj Rajaratnam. Thus, the Circuit observed that "Gupta and Rajaratnam were 'very close friend[s],'" and that Gupta was on a short list of only five to ten people allowed to speak with Rajaratnam at the end of the trading day. *United States v. Gupta*, 747 F.3d 111, 121 (2d Cir. 2014).

Moreover, as the Circuit painstakingly detailed:

> Gupta and Rajaratnam were also involved in several business ventures together. In 2005, they, along with a third partner, formed Voyager Capital

>   Partners Ltd. ("Voyager"), an investment fund capitalized with $50 million, $5 million of which was contributed by Gupta and $40 million by Rajaratnam; Gupta later borrowed $5 million from Rajaratnam in order to buy out the third partner's share, giving Gupta a $10 million stake in Voyager. . . . In 2007, Gupta, Rajaratnam, and two others launched another investment fund, New Silk Route, in which Rajaratnam invested $50 million; Gupta was the chairman. Gupta was also heavily involved in Galleon itself. He had invested several million dollars in Galleon funds; he was involved in the planning of a new Galleon fund called Galleon Global (which ultimately was not created); he had a keycard allowing him access to Galleon's New York offices; and he regularly worked on Galleon's behalf in seeking potential investors. In early 2008, Gupta was made chairman of Galleon International, which, as of April 2008, managed assets totaling some $1.1 billion and could earn "performance fees." Gupta was given a 15 percent ownership stake.

*Id.* It is simply not accurate to say that the benefits in this case – year-old analysts' reports and professional referrals that were unsolicited and unnecessary – or the personal relationship – Mr. Chow and Mr. Yin were casual business acquaintances at best – are comparable to the *Gupta* case or any of the others relied on by the government.

The Section 3553(a) factors obligate the Court to impose a sentence that "avoid[s] unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). The government offers no compelling reason why Mr. Chow should be sentenced to more prison time than, for example, Todd Newman (54 months), Anthony Chiasson (78 months), or Michael Steinberg (42 months), who were each convicted of trading in advance of the earnings announcements of publicly traded companies over eight successive quarters and reaping more than $70 million in profits for their respective hedge funds. Or why the sentence recommended by the government is only slightly less than that imposed on Mathew Martoma (108 months), whose misconduct yielded record profits for his hedge fund.

On the spectrum of the more than 100 cases prosecuted in the District within the last decade, a Guidelines-range sentence for Mr. Chow would place him near the top of the worst insider traders ever prosecuted, and far above those defendants who, like Mr. Chow, earned nothing for their crimes. Such a sentencing disparity would be manifestly unjust.

### B. The Government's Recidivism Argument is Highly Unusual and Improper

The government's claim that Mr. Chow should be punished more harshly because he made the commonplace decision to decline to discuss the facts of this case during his presentencing interview with the Probation Office should be rejected. Gov't Mem. at 18. The government's argument – which defense counsel has never seen advanced before – would effectively penalize any defendant who seeks to appeal a trial conviction.

As set forth in Mr. Chow's post-trial briefs, he believes there are compelling legal challenges to the verdict in this case, and he intends to preserve his ability to pursue all available

legal remedies without conceding facts or making statements that could potentially damage his position on appeal. Indeed, should he win a new trial, any statements made to the Probation Office could potentially be used against him. For these and other reasons, virtually all defendants who are convicted at trial decline to address the underlying facts of their convictions with the Probation Office. Mr. Chow is, of course, not entitled to a Guidelines reduction for acceptance of responsibility, but he should not be punished for exercising his right to appeal.

The government cites no authority for its remarkable claim. Nor does the government offer any explanation for how Mr. Chow's perfectly reasonable – and legally necessary – decision to decline to discuss the facts of this case with the Probation Office somehow suggests that he poses a greater risk of recidivism. To the contrary, Mr. Chow acknowledges, accepts, and understands the jury's verdict, and there is absolutely no compelling basis to argue that he is likely to commit any future crimes merely because he elected not to speak to Probation about the offense conduct here. *See* PSR at 36 (Mr. Chow "appears to pose a low risk of recidivism").

**III. The Proposed Restitution Order for Lattice's Legal Costs is Unlawful**

The government has failed to carry its burden of showing by a preponderance of the evidence that Lattice is entitled to **any** restitution, let alone the requested attorneys' fees in the amount of $1,471,196.48. The government's submission of a conclusory declaration from Lattice's counsel and over one hundred pages of **redacted** legal bills does not provide a basis for the Court to make a competent ruling that the fees sought were "necessary" under the MVRA. 18 U.S.C. § 3664A(b)(4); *id.* (b)(e) ("The burden of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the Government."); *Lagos v. United States*, 138 S. Ct. 1684, 1689 (2018) ("The statute provides for mandatory restitution, and the portion we construe is limited to '*necessary* ... other expenses.'") (citing § 3664A(b)(4) (emphasis in original)); *see also United States v. Cuti*, 778 F.3d 83, 95 (2d Cir. 2014) ("[T]o be 'necessary' for restitution, it is not enough that the expenses incurred helped the investigation.") (citations omitted). The Second Circuit reviews findings relating to restitution orders for abuse of discretion, save for questions of law, which are reviewed *de novo*. *See United States v. Boccagna*, 450 F.3d 107, 113 (2d Cir. 2006).

In support of its claim that $1.4 million in fees accrued by four different law firms representing Lattice and two trial witnesses – Lattice's former CEO and its lead outside investment banker – are compensable as restitution, the government has submitted a declaration (the "Declaration") from Kevin Shock, an attorney at Perkins Coie, Lattice's outside counsel, which is manifestly insufficient under the law. The Declaration states in conclusory fashion that Mr. Schock examined the invoices for three of the firms, and spoke with another attorney who examined the invoices for the fourth firm, and that Mr. Schock and the other attorney "determined" that all of the requested fees were incurred "for participation in the investigation or prosecution of Mr. Chow's offenses" or "for attendance at proceedings related to Mr. Chow's offenses." Decl. of Kevin R. Schock, ECF 148-1, ¶¶ 10-14. As purported support for these conclusions, the Declaration attaches four sets of exhibits consisting of invoices from the firms with all descriptions of the work performed **redacted in their entirety**. Mr. Schock does not indicate in his Declaration that unredacted copies of the invoices were provided either to the Court or the government. None were provided to Mr. Chow.

The Declaration would have been insufficient to support a restitution award even before the *Lagos* decision. *See United States v. Gupta*, 925 F. Supp. 2d 581, 587 (S.D.N.Y. 2013) (awarding restitution only after review of billing records and reducing fees owed by 10% based on a finding that certain work appeared unrelated to criminal investigation or where "the number of attorneys staffed on a task … exceeded what was reasonably necessary under the MVRA"); *see also United States v. Cuti*, 708 Fed. App'x 21, 25 (2d Cir. 2017) ("We have noted the crucial distinction between actions that merely 'helped' [ ] the prosecution and actions deemed truly necessary. The latter are compensable, and the former are not.") (citations omitted). After *Lagos*, however, it is unquestionably error for the Court to issue a restitution award based on the Declaration, which includes nothing **other than** bare-bones assertions that Lattice's counsel has "determined" that the fees incurred were appropriate under the MVRA. Thus, because the government has failed to provide unredacted invoices, or any other supporting evidence, Mr. Chow – and the Court – are left without any basis to examine or challenge the unilateral determination apparently made by Lattice's counsel. Notably, it does not appear that even the government has had any opportunity to conduct a review of the unredacted invoices to satisfy itself that the MVRA's standards, consistent with *Lagos*, have been met with respect to the approximately $1.4 million sought by Lattice.

Indeed, post-*Lagos*, **the government** conceded that a similarly conclusory restitution request was legally insufficient. In the insider trading prosecution in *United States v. Walters*, the government initially took the position that a declaration from outside counsel for the victim-entity (Dean Foods) was sufficient under the MVRA where it made the conclusory assertion that the entity had suffered "losses compensable under the [MVRA]" and attached legal invoices that either omitted descriptions of the work performed or included descriptions with substantial redactions. 16 Cr. 338 (PKC), ECF Nos. 218, Dean Foods Declaration, and 217, Gov't Letter. On October 20, 2017, the district court in *Walters*, on the basis of the declaration and the government's submission, declined to require the provision of more detailed billing records and ordered the defendant to pay approximately $8.8 million in restitution. *Id.* ECF No. 235, Order of Restitution.

On October 23, 2017, Walters appealed the restitution order, among other things. The government argued in its initial appellate brief that the underlying restitution order was appropriate, relying in part on its view that no "careful parsing of billing records" was required because counsel was hired "specifically to help [Dean Foods] respond to and represent witnesses in connection with DOJ and SEC investigations." *United States v. Walters*, No. 17-2373, ECF No. 123, Appellee Br. at 64-67. However, on May 29, 2018, after oral argument before the Second Circuit, the Supreme Court issued its decision in *Lagos*, holding that MVRA restitution is limited to "necessary" expenses incurred during participation in "government investigations and criminal proceedings," and excludes expenses incurred during "private investigations." *Lagos*, 138 S.Ct. at 1687; *see id.* at 1690 ("[The MVRA] does not cover the costs of a private investigation that the victim chooses on its own to conduct.").

Approximately one week after the *Lagos* decision was issued, the government in *Walters* reversed its position and conceded that, in light of *Lagos*, it would consent to "a limited remand to allow the District Court to determine whether the attorney's fees encompassed in the original restitution award were incurred during participation in the investigation or prosecution of the offense, consistent with the Supreme Court's guidance in *Lagos*." *Walters*, No. 17-2373, ECF No. 157, Gov't Letter dated June 8, 2018 (quotation marks omitted). The Second Circuit "agree[d],"

vacated the restitution order, and remanded for the district court to further consider whether the government had met its burden under the MVRA. *United States v. Walters*, -- F.3d --, 2018 WL 6314126, at *13 (2d Cir. Dec. 4, 2018).

In its sentencing submission in this case, the government does not attempt to explain why the Declaration in *Walters* was insufficient but the Declaration in this case is proper. As the government has already acknowledged in *Walters*, the MVRA requires the government to do more than what it has done here. Accordingly, the government's request for restitution should be denied.

\* \* \*

For all the foregoing reasons, and those set forth in Mr. Chow's Sentencing Memorandum, we believe that Mr. Chow is precisely the type of low-risk defendant who merits a second chance.[1] We respectfully request that the Court impose a sentence of time served with a period of home confinement.

Respectfully submitted,

/s/_____
Katherine R. Goldstein
George S. Canellos
Adam Fee

cc: AUSA Elisha Kobre (via ECF)
AUSA Scott Hartman (via ECF)
AUSA Max Nicholas (via ECF)

---

[1] On December 21, 2018, following the submission of Mr. Chow's sentencing submission, the President signed into law the FIRST STEP Act of 2018 which passed with overwhelming bipartisan support in both the Senate (87-12) and the House (358-36). *See* First Step Act of 2018, S. 756-2, 115th Cong., 2d Sess. (2017-2018). This bipartisan effort, despite a polarizing political divide nationwide, reflects a growing consensus that longer sentences do not necessarily fulfil the ends of justice and that alternatives to custody are appropriate for low-risk, non-violent offenders like Mr. Chow. Specifically, the First Step Act requires the Bureau of Prisons to assess each defendant's recidivism rate and urges placement of defendants with lower risk levels on home confinement with supervision by Probation instead of imprisonment. *Id.* §§ 101, 102 (amending 18 U.S.C. §§ 3631, 3632); *id.* at § 602 (amending 18 U.S.C. § 3624(c)(2)).